GIBSON, DUNN & CRUTCHER LLP
THEODORE J. BOUTROUS, JR., SBN 132099
tboutrous@gibsondunn.com
KATHERINE M. MARQUART, SBN 248043
kmarquart@gibsondunn.com
JESSE S. GABRIEL, SBN 263137
jgabriel@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520

ETHAN D. DETTMER, SBN 196046
edettmer@gibsondunn.com
555 Mission Street
San Francisco, CA 94105
Telephone: (415) 393-8200
Facsimile: (415) 393-8306

PUBLIC COUNSEL
MARK D. ROSENBAUM, SBN 59940
mrosenbaum@publiccounsel.org
JUDY LONDON, SBN 149431
jlondon@publiccounsel.org
610 South Ardmore Avenue
Los Angeles, CA 90005
Telephone: (213) 385-2977
Facsimile: (213) 385-9089

Attorneys for Plaintiffs DULCE GARCIA,
MIRIAM GONZALEZ AVILA, SAUL
JIMENEZ SUAREZ, VIRIDIANA CHABOLLA
MENDOZA, NORMA RAMIREZ, and
JIRAYUT LATTHIVONGSKORN

[*Additional Counsel Listed on Next Page*]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA; DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security,<br><br>Defendants. | CIVIL CASE NO.:<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

1   Additional Counsel for Plaintiffs

2   BARRERA LEGAL GROUP, PLLC
3   LUIS CORTES ROMERO, SBN 310852
    lcortes@barreralegal.com
4   19309 68th Avenue South, Suite R102
    Kent, WA 98032
5   Telephone: (253) 872-4730
    Facsimile: (253) 237-1591

6
    LAURENCE H. TRIBE, SBN 39441
7   larry@tribelaw.com
    Harvard Law School
8   *Affiliation for identification purposes only
    1575 Massachusetts Avenue
9   Cambridge, MA 02138
    Telephone: (617) 495-1767
10

11  ERWIN CHEMERINSKY, *pro hac vice* forthcoming
    echemerinsky@law.berkeley.edu
12  University of California, Berkeley School of Law
    *Affiliation for identification purposes only
13  215 Boalt Hall
    Berkeley, CA 94720-7200
14  Telephone: (510) 642-6483

15  LEAH M. LITMAN, *pro hac vice* forthcoming
    llitman@law.uci.edu
16  University of California, Irvine School of Law
    *Affiliation for identification purposes only
17  401 East Peltason Drive
    Irvine, CA 92697
18  Telephone: (949) 824-7722

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**INTRODUCTION**

The young women and men filing this lawsuit embody the American Dream.  Brought to this country as children and raised in families that often struggled with poverty and homelessness, each has achieved remarkable success through hard work, fierce determination, and incredible resilience. These are characteristics that have defined Americans throughout our Nation's history.  Plaintiffs in this case are also alike in that each has committed to helping others, choosing to direct their time, energy, and considerable talents toward defending, healing, educating, and uplifting individuals and communities that are too often ignored.  While each of the Plaintiffs is remarkable in his or her own right, their stories of success—and their commitment to serving others—are common among the nearly 800,000 young people who have come to rely on the Deferred Action for Childhood Arrivals ("DACA") program.

The decision to end the DACA program is a broken promise and an unprecedented violation of the constitutional rights of Plaintiffs and other young people who relied on the federal government to honor that promise.  The government established the DACA program with great fanfare in 2012. Under DACA, individuals who were brought to the United States as children and meet certain criteria, and who are investigated and found to pose no threat to public safety or national security, are granted deferred action and work authorization for a two-year period, subject to renewal.  These young people are commonly referred to as "Dreamers" in recognition of the fact that they have long called this country home and aspire to be part of the American Dream.

To apply for DACA, eligible individuals are required to provide the government with highly sensitive personal information, pay a substantial fee, and submit to a rigorous Department of Homeland Security background check.  Initially, the DACA program was met with skepticism in immigrant communities, as many Dreamers were understandably reluctant to voluntarily disclose information (including their current home address) that could facilitate their removal from the United States and place their family members at risk.  To combat this fear the government launched an extensive outreach campaign urging Dreamers to apply for DACA, repeatedly promising that they would be able to renew their DACA status and that information they provided in connection with the program would not be used for immigration enforcement purposes.  As a result, hundreds of

1    thousands of young people applied for, and were granted, DACA status.  The government quickly

2    realized the administrative, law enforcement, public safety, and economic benefits it sought in

3    establishing the program.

4         In creating DACA, the government offered Plaintiffs and other Dreamers a straightforward

5    deal—if they stepped forward, shared sensitive personal information, and passed a background check,

6    they would be granted renewable protection and would be allowed to live and work in the United

7    States provided that they played by the rules.  DACA also provided access to important benefits, and

8    enabled recipients to open bank accounts, obtain credit cards, start businesses, purchase homes and

9    cars, and conduct other aspects of daily life that were otherwise often unavailable to them.  In so

10   doing, DACA has allowed Plaintiffs and nearly 800,000 young people to become contributing

11   members of society and pursue the American Dream.

12        In taking the irreversible step of identifying themselves to the government, Plaintiffs and

13   other Dreamers trusted the government to honor its word and uphold its end of the bargain.  In

14   reliance on the government's promises, DACA recipients took out student loans, accepted job offers,

15   moved to new cities, started businesses, bought homes and cars, and made numerous other life

16   changing decisions.  They allowed themselves to fall in love, get married, and start families, trusting

17   that the security and work authorization provided under DACA would enable them to care for (and

18   remain in this country with) their spouses and children.

19        The transformative impact DACA had for Plaintiffs cannot be overstated.  Brought to this

20   country as young children, Plaintiffs have spent virtually their entire lives in the United States.  They

21   consider themselves to be Americans and call our nation home.  Yet for much of their lives, Plaintiffs

22   were denied basic opportunities and prohibited from realizing their full potential.  But DACA

23   changed everything.  Beyond a work permit and access to a professional license, DACA provided

24   Plaintiffs the certainty and security necessary to enroll in graduate programs, open businesses, hire

25   employees, build relationships with clients, patients, and students, and begin to start families of their

26   own.  Plaintiffs were able to take these risks, and enjoy the benefits of their hard work, because they

27   trusted the government to honor its promises and live up to its word.

28

Notwithstanding the severe harm it will inflict, the government arbitrarily decided to break its promises to Plaintiffs and hundreds of thousands of other Dreamers by terminating the DACA program.  This cruel bait and switch, which was motivated by unconstitutional bias against Mexicans and Latinos, violates the equal protection component of the Fifth Amendment, the due process rights of Plaintiffs and other DACA recipients, and federal law, including the Administrative Procedure Act.  Plaintiffs therefore seek equitable and injunctive relief to enjoin this unlawful and unconstitutional action, and respectfully request that the Court compel the government to honor its promises and uphold its end of the DACA bargain.

### JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT

1.  This Court has jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States.  This Court has additional remedial authority under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, and the Administrative Procedure Act, 5 U.S.C. §§ 701–706.

2.  Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1) because at least one plaintiff resides in this District, a substantial part of the events or omissions giving rise to this action occurred in this District, and each defendant is an agency of the United States or an officer of the United States sued in his or her official capacity.

3.  Pursuant to Local Rules 3-2(c) and (d), intradistrict assignment is proper in San Francisco or Oakland because a substantial part of the events or omissions which give rise to the claim occurred in the Counties of San Francisco and Alameda.

### PARTIES

4.  Plaintiff Dulce Garcia ("Ms. Garcia") is a DACA recipient and an attorney in San Diego, California.  Ms. Garcia earned her bachelor's degree from the University of California, San Diego and her law degree from the Cleveland-Marshall College of Law.  She was brought to the United States from Mexico when she was four years old.  The government's decision to terminate the DACA program will deprive Ms. Garcia of her DACA status and the numerous valuable benefits she is entitled to by virtue of that status.  The termination of DACA also will frustrate Ms. Garcia's ability to represent her clients and harm the dozens of individuals who rely on her counsel.

Gibson, Dunn &
Crutcher LLP

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

5.      Plaintiff Viridiana Chabolla Mendoza ("Ms. Chabolla") is a DACA recipient and a first-year law student at the University of California, Irvine School of Law.  Ms. Chabolla was brought to the United States from Mexico when she was two years old.  The government's decision to terminate the DACA program will deprive Ms. Mendoza of her DACA status and the numerous valuable benefits she is entitled to by virtue of that status.  The termination of DACA also will frustrate Ms. Chabolla's ability to fulfill her dream of working as a lawyer and helping individuals from disadvantaged and underrepresented communities obtain justice through the legal system.

6.      Plaintiff Jirayut ("New") Latthivongskorn ("Mr. Latthivongskorn") is a DACA recipient and a fourth-year medical student at the University of California, San Francisco ("UCSF") School of Medicine.  He is also a candidate for a Master of Public Health degree from the T.H. Chan School of Public Health at Harvard University.  Mr. Latthivongskorn was brought to the United States from Thailand when he was nine years old.  The government's decision to terminate the DACA program will deprive Mr. Latthivongskorn of his DACA status and the numerous valuable benefits he is entitled to by virtue of that status.  The termination of DACA also will frustrate Mr. Latthivongskorn's ability to fulfill his dream of becoming a doctor and providing care to underserved and unprivileged communities.

7.      Plaintiff Norma Ramirez ("Ms. Ramirez") is a DACA recipient and a candidate for a Ph.D. in Clinical Psychology from the Fuller Theological Seminary in Pasadena, California.  Ms. Ramirez was brought to the United States from Mexico when she was five years old.  The government's decision to terminate the DACA program will deprive Ms. Ramirez of her DACA status and the numerous valuable benefits she is entitled to by virtue of that status.  The termination of DACA also will frustrate Ms. Ramirez's ability to realize her dream of opening a free multidisciplinary therapy clinic to immigrant youth and their families.

8.      Plaintiff Miriam Gonzalez Avila ("Ms. Gonzalez") is a DACA recipient and a teacher at Crown Preparatory Academy in Los Angeles, California.  She is also a candidate for a Master of Arts in Urban Education from Loyola Marymount University.  Ms. Gonzalez was brought to the United States from Mexico when she was six years old.  The government's decision to terminate the DACA program will deprive Ms. Gonzalez of her DACA status and the numerous

1   valuable benefits she is entitled to by virtue of that status.  The termination of DACA also will

2   frustrate Ms. Gonzalez's ability to teach children in underserved communities, thereby harming the

3   children, families, and community who have come to rely on her.

4       9.      Plaintiff Saul Jimenez Suarez ("Mr. Jimenez") is a DACA recipient and a special

5   education teacher, coach, and mentor in Los Angeles, California.  Mr. Jimenez was brought to the

6   United States from Mexico when he was one year old.  The government's decision to terminate the

7   DACA program will deprive Mr. Jimenez of his DACA status and the numerous valuable benefits

8   he is entitled to by virtue of that status.  The termination of DACA also will frustrate Mr. Jimenez's

9   ability to teach and coach young people, including those with special needs, thereby harming dozens

10  of families and making poorer the community that he is serving and making a better place.

11      10.     Defendant United States of America includes all government agencies and

12  departments responsible for the implementation, administration, and termination of the DACA

13  program.

14      11.     Defendant Donald J. Trump is the President of the United States.  President Trump

15  made the decision to terminate the DACA program and is sued in his official capacity.

16      12.     Defendant Department of Homeland Security ("DHS") is a cabinet department of the

17  federal government with responsibility for, among other things, administering and enforcing the

18  nation's immigration laws.

19      13.     Defendant Elaine Duke is the Acting Secretary of Homeland Security and is sued in

20  her official capacity.  Secretary Duke is responsible for managing DHS, including the administration

21  and enforcement of policies and practices related to DACA.

22                          **STATEMENT OF FACTS**

23  **Establishment of the DACA Program**

24      14.     On June 15, 2012, then-Secretary of Homeland Security Janet Napolitano issued a

25  memorandum establishing the DACA program (the "2012 DACA Memorandum").  Under DACA,

26  individuals who were brought to the United States as young children and who met certain specific

27  criteria could request deferred action for a period of two years, subject to renewal.  In exchange,

28

Gibson, Dunn &
Crutcher LLP

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
5

DACA applicants were required to provide the government with highly sensitive personal information, submit to a rigorous background check, and pay a considerable fee.[1]

15.      Deferred action is a well-established form of prosecutorial discretion under which the government defers removal action against an individual for a specified period, subject to renewal.  The 2012 DACA Memorandum explained that DACA covers "certain young people who were brought to this country as children and know only this country as home" and that the immigration laws are not "designed to remove productive young people to countries where they may not have lived or even speak the language."[2]

16.      The 2012 DACA Memorandum established specific criteria that "should be satisfied before an individual is considered for an exercise of prosecutorial discretion."[3]  They are that the applicant:

- came to the United States under the age of sixteen;
- has continuously resided in the United States for at least five years preceding the date of the memorandum and is present in the United States on the date of the memorandum;
- is currently in school, has graduated from high school, has obtained a general education development certificate, or is an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;
- has not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise poses a threat to national security or public safety; and
- is not above the age of thirty.[4]

---

[1]  Memorandum from Secretary Janet Napolitano, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children, at 1–2 (June 15, 2012), https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf (hereinafter "2012 DACA Memorandum").

[2]  *Id.*

[3]  *Id.* at 1.

[4]  *Id.*

17.     The 2012 DACA Memorandum further provided that "[n]o individual should receive deferred action . . . unless they first pass a background check and requests for relief . . . are to be decided on a case by case basis."[5]

18.     USCIS describes DACA as follows:  "Deferred action is a discretionary determination to defer a removal action of an individual as an act of prosecutorial discretion.  For purposes of future inadmissibility based upon unlawful presence, an individual whose case has been deferred is not considered to be unlawfully present during the period in which deferred action is in effect.  An individual who has received deferred action is authorized by DHS to be present in the United States, and is therefore considered by DHS to be lawfully present during the period deferred action is in effect.  However, deferred action does not confer lawful status upon an individual, nor does it excuse any previous or subsequent periods of unlawful presence."[6]

19.     Like other forms of deferred action, DACA serves the government's interests by allowing the government to prioritize resources and exercise discretion for its own convenience.  DACA also has provided the government with tremendous law enforcement, public safety, and economic benefits.  As the government has recognized, our nation "continue[s] to benefit . . . from the contributions of those young people who have come forward and want nothing more than to contribute to our country and our shared future."[7]

**The DACA Application and Renewal Process**

20.     To apply for DACA, applicants must submit extensive documentation establishing that they meet the relevant criteria.[8]  Applicants must also submit a Form I-765 Application for Employment Authorization, and pay $495 in fees.[9]

---

[5]  *Id.* at 2.

[6]  USCIS DACA FAQs (Archived), Question 1, https://www.uscis.gov/archive/frequently-asked-questions (hereinafter "USCIS DACA FAQs").

[7]  Letter from Secretary Jeh Charles Johnson to U.S. Representative Judy Chu (Dec. 30, 2016), https://chu.house.gov/sites/chu.house.gov/files/documents/DHS.Signed%20Response%20to%20 Chu%2012.30.16.pdf (hereinafter "Secretary Johnson Letter").

[8]  USCIS DACA FAQs, Questions 28–41.

[9]  *Id.*, Question 7; *see also* USCIS, I-821D, Consideration of Deferred Action for Childhood Arrivals, https://www.uscis.gov/i-821d.

Gibson, Dunn &
Crutcher LLP

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

21.     DACA applicants must also undergo biometric and biographic background checks. When conducting these checks, DHS reviews the applicant's biometric and biographic information "against a variety of databases maintained by DHS and other federal government agencies."[10]  If any information "indicates that [the applicant's] presence in the United States threatens public safety or national security," the applicant will be ineligible for DACA absent "exceptional circumstances."[11]

22.     DACA is not limited to a single, two-year deferral of action.  On the contrary, the ability to renew DACA status is an essential element of the program and one of the main benefits used to induce Dreamers to step forward, subject themselves to a rigorous background investigation, and share sensitive personal information with the government.  Indeed, the government clearly understood from the very beginning that Dreamers would not apply for DACA, and the program would not be successful, unless they were promised the opportunity to renew their DACA status.

23.     To that end, the 2012 DACA Memorandum explicitly directs that DACA be "*subject to renewal*, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States."[12]  That memorandum also makes clear that DACA is meant to protect "productive young people" who "were brought to this country as children and know only this country as home" and not merely postpone their removal for two years.[13]

24.     DHS also established a straightforward renewal process for DACA and "strongly encourage[d]" DACA recipients to submit their renewal request in advance of the relevant expiration date.[14]  Moreover, DACA renewal does not require DACA recipients to meet all of the initial criteria for the program, nor does it require them to submit additional documents.[15]  On the contrary, to qualify for renewal, DACA recipients are required to meet three basic criteria:  (1) they must not have left the United States without advance parole; (2) they must have continuously

---

[10]  USCIS DACA FAQs, Question 23.

[11]  *Id.*, Question 65.

[12]  2012 DACA Memorandum, at 3 (emphasis added).

[13]  *Id.*

[14]  USCIS DACA FAQs, Question 49.

[15]  *Id.*, Questions 53–54.

Gibson, Dunn & Crutcher LLP

resided in the United States after submitting their DACA application; and (3) they must not have been convicted of a felony, a significant misdemeanor, or three or more misdemeanors, or otherwise pose a threat to national security or public safety.[16]

25.     DHS "Standard Operating Procedures" also provide that, absent an "Egregious Public Safety" issue or other special circumstances, DACA status should not be revoked until the government has provided a "Notice of Intent to Terminate" which "thoroughly explain[s]" the grounds for the termination.[17]  DHS policy further provides that the recipients of such notice should be afforded 33 days to "file a brief or statement contesting the grounds cited in the Notice of Intent to Terminate" prior to termination of DACA status.[18]

26.     Collectively, these policies and procedures, and the representations of numerous government officials, created a clear and reasonable expectation among DACA recipients that they would be entitled to continuously renew their DACA status so long as they stayed out of trouble and played by the rules.

**Benefits Provided Under the DACA Program**

27.     DACA confers numerous important benefits on those who apply for and are granted DACA status.  Notably, DACA recipients are granted the right not to be arrested or detained based solely on their immigration status during the time period their deferred action is in effect.[19]

28.     DACA recipients are also eligible for work authorization under longstanding regulations.  As USCIS has explained, "an individual whose case has been deferred is eligible to receive employment authorization for the period of deferred action . . . ."[20]

---

[16]  *Id.*, Question 51.

[17]  *See* DHS National Standard Operating Procedures (SOP): Deferred Action for Childhood Arrivals (DACA), at 132, 144–45 (Apr. 4, 2013), https://cliniclegal.org/sites/default/files/attachments/daca_sop_4-4-13.pdf (the "DACA SOP").

[18]  *Id.*

[19]  *See* USCIS DACA FAQs, Question 9 ("[I]f an individual meets the guidelines for DACA, CBP or ICE should exercise their discretion on a case-by-case basis to prevent qualifying individuals from being apprehended."); 2012 DACA Memorandum, at 2; *see also Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1058–59 (9th Cir. 2014).

[20]  USCIS DACA FAQs, Question 1.

29.     DACA recipients are eligible to receive certain public benefits.  These include Social Security, retirement, and disability benefits, and, in certain states, benefits such as driver's licenses, health care, financial aid, tuition benefits, and unemployment insurance.[21]

30.      DACA also serves as a gateway to numerous other important public and private practical benefits, and enables recipients to open bank accounts, obtain credit cards, start businesses, purchase homes and cars, and conduct other aspects of daily life that would otherwise often be unavailable to them.

31.     DACA also confers certain immigration benefits and the ability to travel abroad. For example, DACA recipients do not accrue time under 8 U.S.C. § 1182(a)(9)(B)(i), and may briefly depart the U.S. and legally return under certain circumstances.[22]

32.     As the government has recognized, DACA has enabled hundreds of thousands of young people "to enroll in colleges and universities, complete their education, start businesses that help improve our economy, and give back to our communities as teachers, medical professionals, engineers, and entrepreneurs—all on the books."[23]

**The Government's Promises and Its Efforts to Promote DACA**

33.     When the DACA program was first launched, many eligible Dreamers were understandably reluctant to step forward and voluntarily disclose sensitive personal information (including their current home address) that could facilitate their removal from the United States and place their family members at risk.  In response, the government launched an extensive outreach campaign and vigorously promoted the DACA program.  Among other efforts, the government provided advice and guidance to civic organizations and education professionals about "best practices" they could use to encourage eligible individuals to apply for the program.  The government also hosted informational workshops, and senior government officials—including President Obama—encouraged young people to apply for the program.

---

[21]  *See* 8 U.S.C. §§ 1611(b)(2)–(3), 1621(d); *Texas v. United States*, 809 F.3d 134, 148 (5th Cir. 2015); *Ariz. Dream Act Coal. v. Brewer*, 81 F. Supp. 3d 795, 811 (D. Ariz. 2015); *see also, e.g.*, Cal. Educ. Code §§ 66021.6-66021.7, 68130.5, 76300.5; Cal. Code Regs. tit. 22, § 50301.3.

[22]  *See* USCIS DACA FAQs, Question 57.

[23]  Secretary Johnson Letter, at 2.

34.     The government reiterated these promises in its official correspondence, vowing that DACA recipients would not lose their benefits—including the ability to renew their DACA status—absent specified misconduct.  For example, the approval notice granting deferred action under DACA lists only "fraud or misrepresentation" in the application process or "[s]ubsequent criminal activity" as grounds for revoking DACA.[24]

35.     The government also made promises about information provided by DACA recipients as part of its efforts to promote the program.  In particular, since the inception of the DACA program, the government has repeatedly represented to applicants, Congress, and the general public that information provided by DACA applicants about themselves or others (including family members) would not be used for immigration enforcement purposes absent special circumstances.

36.     As then-Secretary of Homeland Security Jeh Johnson explained, "[s]ince DACA was announced in 2012, DHS has consistently made clear that information provided by applicants . . . will not later be used for immigration enforcement purposes except where it is independently determined that a case involves a national security or public safety threat, criminal activity, fraud, or limited other circumstances where issuance of a notice to appear is required by law."[25]

37.     Secretary Johnson further explained that this approach was the "long-standing and consistent practice of DHS (and its predecessor INS)" for many "decades" in the use of information "submitted by people seeking deferred action" under a wide variety of programs, as well as applicants seeking immigration "benefits or relief" under a number of other programs.[26]  According to Secretary Johnson, "DACA applicants most assuredly relied" upon "these representations" and the agency's "consistent practice" stretching back decades.[27]

38.     The government's promise not to use information provided by applicants for immigration enforcement purposes also appears in the USCIS's official instructions regarding the DACA application process.  Those instructions provide:

---

[24] The University of Washington, I-797 DACA Approval Sample, https://registrar.washington.edu/i-797-daca-approval_sample.

[25] Secretary Johnson Letter, at 1.

[26] *Id.* at 1–2.

[27] *Id.* at 1.

*Information provided in this request is protected from disclosure to ICE and U.S. Customs and Border Protection (CBP) for the purpose of immigration enforcement proceedings* unless the requestor meets the criteria for the issuance of a Notice To Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance (www.uscis.gov/NTA).  The information may be shared with national security and law enforcement agencies, including ICE and CBP, *for purposes other than removal*, including for assistance in the consideration of deferred action for childhood arrivals request itself, to identify or prevent fraudulent claims, for national security purposes, or for the investigation or prosecution of a criminal offense.  The above information sharing clause covers family members and guardians, in addition to the requestor.[28]

39.    The same promise appears on the DHS website, which states that "[i]nformation provided in this request [for DACA] *is protected from disclosure* to ICE and CBP for the purpose of immigration enforcement proceedings unless the requestor meets the criteria for the issuance of a Notice To Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance (www.uscis.gov/NTA).  Individuals whose cases are deferred pursuant to DACA will not be referred to ICE."[29]

40.    That same promise is also included in DHS's official, and statutorily-required, Privacy Impact Assessment for the DACA program.[30]

41.    Numerous public officials from both political parties have reinforced these promises and have recognized that Dreamers have relied on the government to keep its word.  For example, in December 2016, then-Secretary of Homeland Security Jeh Charles Johnson acknowledged that there are hundreds of thousands of Dreamers who have "relied on the U.S. government's representations" about DACA, and he asserted that "representations made by the U.S. government, upon which DACA applicants most assuredly relied, must continue to be honored."[31]

---

[28]  Instructions for Consideration of Deferred Action for Childhood Arrivals, USCIS Form I-821D at 13 (Jan. 9, 2017 ed.), https://www.uscis.gov/sites/default/files/files/form/i-821dinstr.pdf (emphasis added).

[29]  USCIS DACA FAQs, Question 19.  The referenced Notice to Appearance guidance is USCIS Policy Memorandum 602-0050 (Nov. 7, 2011) ("Revised Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Removable Aliens").

[30]  DHS, *Privacy Impact Assessment, USCIS, Deferred Action for Childhood Arrivals* 13 (Aug. 15, 2012), https://www.dhs.gov/sites/default/files/publications/privacy/privacy_pia_uscis_daca.pdf; *see* E-Government Act of 2002 Sec. 208(b), Pub L. No. 107-347, 116 Stat. 2899, 2921 (codified as amended at 44 U.S.C. § 3501 note).

[31]  Secretary Johnson Letter, at 1.

42.    In January 2017, Speaker of the House Paul Ryan stated that the government must ensure that "the rug doesn't get pulled out from under" Dreamers, who have "organize[d] [their] li[ves] around" the DACA program.[32]

43.    Also in January 2017, Senator Lindsey Graham stated that the government should not "pull the rug out and push these young men and women—who came out of the shadows and registered with the federal government—back into the darkness."[33]

44.    In February 2017, Congressman Raúl Grijalva described DACA as a "commitment," and called for "the federal government to honor its word to protect" Dreamers.[34]

45.    On February 20, 2017, then-Secretary of Homeland Security John F. Kelly issued a memorandum that "immediately rescinded" all "conflicting directives, memoranda, or field guidance regarding the enforcement of our immigration laws and priorities for removal," but specifically exempted the 2012 DACA Memorandum.[35]

46.    On March 29, 2017, then-Secretary Kelly reaffirmed that "DACA status" is a "commitment . . . by the government towards the DACA person, or the so-called Dreamer."[36]

47.    On April 21, 2017, President Trump said that his administration is "not after the dreamers" and suggested that "[t]he dreamers should rest easy."  When asked if "the policy of [his] administration [is] to allow the dreamers to stay," President Trump answered, "Yes."[37]

---

[32]  Transcript of CNN Town Hall Meeting with House Speaker Paul Ryan, CNN (Jan. 12, 2017), http://cnn.it/2oyJXJJ.

[33]  Lindsey Graham, *Graham, Durbin Reintroduce BRIDGE Act To Protect Undocumented Youth From Deportation* (Jan. 12, 2017), https://www.lgraham.senate.gov/public/index.cfm/2017/1/graham-durbin-reintroduce-bridge-act-to-protect-undocumented-youth-from-deportation.

[34]  Congressional Progressive Caucus Leaders Respond to ICE Arrest of DACA Recipient (Feb. 16, 2017), https://cpc-grijalva.house.gov/press-releases/congressional-progressive-caucus-leaders-respond-to-ice-arrest-of-daca-recipient.

[35]  Memorandum from Secretary John Kelly, Enforcement of the Immigration Laws to Serve the National Interest, at 2 (Feb. 20, 2017), https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Enforcement-of-the-Immigration-Laws-to-Serve-the-National-Interest.pdf (hereinafter "Secretary Kelly Memo").

[36]  Ted Hesson & Seung Min Kim, Wary Democrats Look to Kelly for Answers on Immigration, Politico (Mar. 29, 2017), http://politi.co/2mR3gSN.

[37]  *Transcript of AP Interview With Trump*, CBS News (Associated Press) (Apr. 24, 2017), https://www.cbsnews.com/news/transcript-of-ap-interview-with-trump.

Gibson, Dunn & Crutcher LLP

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**Ms. Garcia Relied on the Government's Promises Regarding DACA**

48.     Dulce Garcia was brought to the United States from Mexico when she was four years old.  Ms. Garcia was raised in a low-income, underserved neighborhood in San Diego, California.  Throughout her childhood, Ms. Garcia lacked health care and her family struggled with poverty and occasional periods of homelessness.

49.     Although she grew up fearing the police and immigration authorities, Ms. Garcia did not learn that she was undocumented until high school.  Around this time, Ms. Garcia began to discover the limitations of being undocumented and was advised by her high school guidance counselor that she would be unable to enroll in college or secure federal financial aid despite her academic record.

50.     Refusing to yield to these limitations, Ms. Garcia continuously sought to enroll at a local community college, despite repeatedly being denied admission because of her immigration status.  Eventually, Ms. Garcia secured admission to the school.  Ms. Garcia later transferred to the University of California, San Diego ("UCSD"), graduating in 2009 with a bachelor's degree in political science and securing honors every quarter she was enrolled at UCSD.  During this time, Ms. Garcia worked full time as a legal assistant at a small law firm, which solidified her childhood dream of becoming an attorney, and often sought out second and third jobs in order to pay for tuition and books.

51.     Ms. Garcia matriculated at the Cleveland-Marshall College of Law in Cleveland, Ohio in 2011.  Because tuition was a flat rate regardless of the number of units, Ms. Garcia sought the Dean's approval to take extra classes during her second and third years.  Ms. Garcia also worked throughout law school as legal assistant to cover tuition and her living expenses.

52.     During her last year of law school, when money was especially tight, Ms. Garcia's mother gave her $5,000 to help pay for tuition.  This sum represented most of Ms. Garcia's mother's life savings, which she had earned working the night shift as a hotel housekeeper.

53.     During Ms. Garcia's second year of law school, the government announced the DACA program.  Ms. Garcia was overjoyed and broke down in tears when she heard the announcement.  Although she was initially skeptical, Ms. Garcia decided that she could trust the

government to honor its promises.  In reliance on the government's promises, she applied for DACA, providing the government with her personal information and the required fees.  Ms. Garcia passed the background check and was granted DACA status in 2014.  In reliance on the government's promises, Ms. Garcia successfully reapplied for DACA status and work authorization in 2016.  Ms. Garcia was admitted to the California Bar in May 2016.

54.     Being granted DACA status was a transformative experience for Ms. Garcia. DACA freed Ms. Garcia from the constant worry that she would be detained and deported every time she stepped outside her home.  It also gave her the confidence to hire several employees, build a thriving law practice, and represent dozens of clients in immigration, civil litigation, and criminal defense cases.  Finally, DACA enabled Ms. Garcia to dream about becoming a mother, allowing her to take the first steps toward becoming a foster parent, with the ultimate goal of adopting a child.

55.     Ms. Garcia trusted the government to honor its promises and advised others that information provided as part of DACA would not be used for immigration enforcement purposes. Even after the new administration was sworn into office, Ms. Garcia continued to trust the government, helping to create a video encouraging eligible young people to apply for DACA.

**Ms. Chabolla Relied on the Government's Promises Regarding DACA**

56.     Viridiana Chabolla was brought to the United States from Mexico when she was two years old.  Ms. Chabolla grew up in Los Angeles, California.  Ms. Chabolla confronted the reality of her undocumented status from an early age, and was unable to participate in certain club and community activities that required a Social Security number.

57.     Ms. Chabolla was inspired to pursue a career in law by her grandfather, who suggested that becoming an attorney would give her "the power to fight injustice with words." Ms. Chabolla was further inspired after meeting a Latino judge from East Los Angeles, whose eloquence, impressive academic credentials, and commitment to the community left a deep impression on her.

58.     Ms. Chabolla enrolled in Pomona College in the fall of 2009 and graduated with a Bachelor of Arts degree in Sociology and Chicana/o-Latina/o Studies in May 2013.  Ms. Chabolla received numerous honors and awards and was deeply involved in campus life.  At the same time,

Gibson, Dunn &
Crutcher LLP

Ms. Chabolla sought out ways to give back to her community, helping to coordinate academic and enrichment activities, SAT preparation classes, and college information sessions for hundreds of students from economically disadvantaged and underrepresented backgrounds.  Ms. Chabolla also created and taught an elective course on the U.S. Civil Rights Movement to high school students.

59.     In 2012, during her final year of college, Ms. Chabolla applied for and was granted DACA status.  In reliance on the promises made by the government, Ms. Chabolla disclosed personal information about herself and her family, paid the required fee, and submitted to a DHS background check.  In reliance on the government's promises, Ms. Chabolla successfully reapplied for DACA status in 2014 and again in 2016.

60.     After graduating from Pomona, Ms. Chabolla was hired as a community organizer at Public Counsel, the nation's largest pro bono law firm.  In that capacity, Ms. Chabolla assisted with landmark civil rights litigation involving educational inequities in the public education system, as well as with efforts to provide essential services to homeless veterans, women, and youth in Los Angeles County.

61.     Ms. Chabolla's experiences at Public Counsel solidified her interest in helping underserved individuals and communities obtain justice through the legal system.  In pursuit of this goal, Ms. Chabolla secured a special fellowship from the law firm of Munger, Tolles & Olson LLP, and enrolled earlier this year as a Public Interest Scholar at the University of California, Irvine School of Law.

**Mr. Latthivongskorn Relied on the Government's Promises Regarding DACA**

62.     New Latthivongskorn was brought to the United States from Thailand when he was nine years old.  Mr. Latthivongskorn was raised in California.  His parents first settled in Fremont, California, where they worked cleaning toilets and mopping floors, and later waiting tables at various restaurants.  In 2004, Mr. Latthivongskorn's parents moved the family to Sacramento to open their own restaurant, hoping that it would allow them to earn enough money to be able to send their children to college.

63.     Growing up, Mr. Latthivongskorn lived with the constant fear that he or his parents might be deported.  Mr. Latthivongskorn began to more acutely experience the challenges of being

undocumented as he grew older, often searching for excuses such as being "deathly afraid of driving" to explain to classmates why he lacked a driver's license.

64.     Mr. Latthivongskorn was inspired to become a doctor after his mother was diagnosed with ovarian tumors during his junior year of high school.  Not only did Mr. Latthivongskorn witness the incredible power of medicine to help those in need, but he also experienced the barriers that low-income immigrants face in navigating the health care system. After this experience, Mr. Latthivongskorn decided that he wanted to devote his life to improving access to health care for immigrant and low-income communities.

65.     Mr. Latthivongskorn's parents taught him that hard work and education were the keys to success.  In addition to waiting tables, washing dishes, and mopping floors in his family's restaurant on nights and weekends, Mr. Latthivongskorn immersed himself in his studies, taking honors and AP classes.  As a result of his hard work, Mr. Latthivongskorn graduated as salutatorian of his high school class and was accepted to UC Berkeley.

66.     Because he lacked a Social Security number, Mr. Latthivongskorn was ineligible for federal financial aid.  However, due to his record of achievement, Mr. Latthivongskorn was offered a prestigious scholarship that promised to cover a significant portion of his educational expenses for four years.  This scholarship was revoked only weeks before classes began after UC Berkeley learned that Mr. Latthivongskorn lacked legal status.  Mr. Latthivongskorn was devastated and considered attending a community college, but his family insisted that he enroll at UC Berkeley.

67.     While Mr. Latthivongskorn thrived at UC Berkeley, he constantly worried about how to finance his education.  To help pay for school, Mr. Latthivongskorn worked as a busboy at a Thai restaurant and secured scholarships from several nonprofit organizations.  Despite his demanding academic and work commitments, Mr. Latthivongskorn devoted significant time to volunteering with several local nonprofit organizations.

68.     In 2011, Mr. Latthivongskorn was robbed at gun point just five blocks from the UC Berkeley campus.  He decided not to report the crime to the police out of fear that stepping forward to law enforcement might lead to him being deported.

69.     While at UC Berkeley, Mr. Latthivongskorn also developed into an activist and learned the power of grassroots community organizing.  Among other efforts, Mr. Latthivongskorn advocated for federal legislation to assist Dreamers, and testified before the California Legislature in support of the California DREAM Act in 2011 and the California TRUST Act in 2013.

70.     In 2012, Mr. Latthivongskorn co-founded Pre-Health Dreamers ("PHD"), a national nonprofit organization that provides advising, resources, and advocacy for undocumented students interested in pursuing careers in health care and science.  In January 2017, *Forbes* Magazine named Mr. Latthivongskorn to its "30 Under 30 in Education" list, commending him for being "on the frontline of getting undocumented students into medical professions and on the path to becoming physicians and health care professionals."

71.     In 2012, Mr. Latthivongskorn graduated with honors from UC Berkeley, earning a degree in Molecular & Cellular Biology and Distinction in General Scholarship.  In spite of his excellent academic record, Mr. Latthivongskorn was told by the deans of admissions at several medical schools that he should not apply to their programs because he was undocumented and that no medical school would invest their resources in training someone who might not be able to stay in the United States.  Refusing to take "no" for an answer, Mr. Latthivongskorn applied to medical school anyway, but was initially turned down.

72.     Exactly one month after Mr. Latthivongskorn graduated from UC Berkeley, the government announced the DACA program.  Believing that he could rely on the government to honor its promises, Mr. Latthivongskorn applied for DACA in the fall of 2012.  He passed the background check and was granted DACA status on January 24, 2013.  In reliance on the government's promises, Mr. Latthivongskorn successfully reapplied for DACA status and work authorization in 2014 and then again in 2016.

73.     Being granted DACA status changed Mr. Latthivongskorn's life.  Because DACA recipients were granted permission to stay in the United States on a renewable basis, medical schools became willing to invest in these students for the several years it takes to complete medical school and residency programs.  Mr. Latthivongskorn reapplied to medical schools, and in 2014, he enrolled at UCSF, one of the most prestigious and selective medical schools in the country.

Mr. Latthivongskorn is part of the Program in Medical Education for the Urban Underserved ("PRIME-US"), and is committed to using his degree to improve health care delivery systems and assist urban underserved communities.

74.     In April 2017, Mr. Latthivongskorn was awarded a prestigious U.S. Public Health Service Excellence in Public Health Award, which is given to medical students who have helped to advance the U.S. Public Health Service's mission to "protect, promote, and advance the health and safety of our Nation."

75.     In August 2017, Mr. Latthivongskorn began pursuing a Master of Public Health at Harvard University.  His goal is to develop a better understanding of health care policy so that he can help to end health disparities and increase access to affordable, quality health care, particularly for immigrants and other underserved communities.

**Ms. Ramirez Relied on the Government's Promises Regarding DACA**

76.     Norma Ramirez was brought to the United States from Mexico when she was five years old.  Ms. Ramirez attended public high school, where she was an honor roll student.  Her undocumented status made an impact on her in high school when she was denied a driver's license and learned that her dreams of going to college might be out of reach.

77.     Ms. Ramirez attended the College of Southern Nevada, and later the University of Nevada, Las Vegas, where she earned a bachelor's degree in psychology in 2014.

78.     Ms. Ramirez could not believe the news in 2012 when her pastor sent her a text message telling her about the DACA program.  Relying on the government's promises under the DACA program, Ms. Ramirez applied for DACA status on August 15, 2012.  Her application was approved on November 1, 2012.  In further reliance on the government's promises, Ms. Ramirez twice reapplied for DACA status and work authorization, and was reapproved in September 2014 and October 2016.

79.     Ms. Ramirez has been inspired to continue her education in clinical psychology in part because her experiences as a volunteer mentor have exposed her to the suffering of countless individuals who do not have access to mental health services, much less access to practitioners who speak their native language or share an understanding of the immigrant experience.  Her motivation

also stems from her own difficulties in finding a supportive environment to discuss the challenges and barriers she has faced as an undocumented immigrant.

80.     In 2015, Ms. Ramirez began her graduate work at the Fuller Theological Seminary in Pasadena, California.  She earned her Master's degree in Clinical Psychology in 2017 and is currently pursuing her Ph.D. in Clinical Psychology.  Since 2016, Ms. Ramirez has worked at an outpatient clinic in Monrovia, California, providing school and home-based therapy to patients in English and Spanish, and also has served as a member of the Board of Directors for the Immigration Resource Center of San Gabriel Valley.

81.     DACA enabled Ms. Ramirez to pursue her dream of establishing a free clinic that provides mental health services to immigrant youth, Latinos, and their families.  As a Dreamer, Ms. Ramirez understands the challenges faced by many of her patients, and is able to secure their trust in a way that many other mental health practitioners cannot.

**Ms. Gonzalez Relied on the Government's Promises Regarding DACA**

82.     Miriam Gonzalez was brought to the United States from Mexico when she was six years old.  She was raised in Los Angeles, California, and graduated from Roosevelt High School in 2011.

83.     Ms. Gonzalez first learned she was undocumented in the seventh grade, after talking with her friends about getting a summer job at an elementary school.  When she asked her parents for her Social Security number so that she could apply to work with her friends, they informed her that she was undocumented and had no Social Security number.

84.     In spite of their undocumented status, Ms. Gonzalez's parents pushed her to get good grades, with the hope that she would go to college.  In high school, Ms. Gonzalez began telling her teachers that she was undocumented, and they provided her with resources about the application process and about a California law allowing undocumented students to pay in-state tuition.

85.     Relying on the government's promises under the DACA program, Ms. Gonzalez applied for DACA status and work authorization in December 2012.  Her application was approved in February 2013.  In further reliance on the government's promises, Ms. Gonzalez successfully reapplied for DACA status and work authorization in December 2014 and October 2016.

86.     Ms. Gonzalez attended college at the University of California, Los Angeles ("UCLA"), graduating in 2016 with a Bachelor of Arts in Anthropology and a minor in Classical Civilizations.  She was named to the Dean's Honors List for her academic performance in the spring of 2015.  While at UCLA, Ms. Gonzalez earned money by tutoring elementary, middle, and high school students, and by working as a campus parking assistant.

87.     Ms. Gonzalez has been active in community service since a young age, focusing her energy on immigrants' rights and education for the underserved.  While at UCLA, she helped to host the 2014 Immigrant Youth Empowerment Conference—the largest immigrant youth conference in the country—as well as an Educators Conference, a DACA clinic, and several additional immigrants' rights workshops.  Ms. Gonzalez also mentored two students at Van Nuys High School, motivating them to pursue a higher education and advising them on the college application process.

88.     Ms. Gonzalez ultimately decided that she could give the most to her community by teaching students in underserved communities.  After graduating from UCLA in 2016, Ms. Gonzalez was accepted into the selective Teach For America ("TFA") program.  Through TFA, Ms. Gonzalez currently teaches Math and Reading Intervention to struggling middle school students at Crown Preparatory Academy in Los Angeles.

89.     In 2017, Ms. Gonzalez received her Preliminary Multiple Subject Teaching Credential from Loyola Marymount University, which is valid until 2022.  Ms. Gonzalez is currently studying at Loyola Marymount to obtain a Master of Arts degree in Urban Education, with a focus in Policy and Administration.  Upon her expected completion of her master's program and her service with TFA in the spring of 2018, Ms. Gonzalez hopes to continue to teach in the Los Angeles area, mentoring and inspiring young students from disadvantaged communities to pursue a higher education and achieve their full potential.

**Mr. Jimenez Relied on the Government's Promises Regarding DACA**

90.     Saul Jimenez was brought to the United States from Mexico when he was one year old.  Mr. Jimenez was raised in the Boyle Heights neighborhood of Los Angeles, California.  He attended Roosevelt High School, where he was a star athlete.  Among other achievements, he was captain of the football team and an all-league wide receiver.  Mr. Jimenez worked throughout high

school, helping his parents make ends meet by delivering newspapers and washing dishes at an Italian restaurant.

91.      Following high school, Mr. Jimenez played football for two years at East Los Angeles Community College, viewing his commitment to the game as a ticket to a four-year university.  At the same time, Mr. Jimenez was also working two or three jobs, and often struggled to stay awake during practice and team meetings.  Mr. Jimenez explored becoming a firefighter and considered a career in law enforcement, but learned that his legal status prevented him from serving his community in these ways.

92.      In 2007, Mr. Jimenez's hard work paid off and he was awarded a football scholarship to Oklahoma Panhandle State University.  Mr. Jimenez again served as team captain and was chosen by his teammates as defensive MVP—now playing as an outside linebacker.

93.      In Oklahoma, Mr. Jimenez began mentoring high school students through the U.S. Department of Education's Upward Bound program.  Mr. Jimenez quickly found that he enjoyed working with young people and was able to connect with and help many of his students.

94.      In 2010, Mr. Jimenez returned to Boyle Heights, working in low-wage jobs in warehouses and restaurants to support his parents and himself.  However, after the government announced the DACA program in 2012, Mr. Jimenez began to believe that he could build a career for himself, and worked to improve his resume.

95.      Relying on the government's promises under the DACA program, Mr. Jimenez successfully applied for DACA status in 2012.  In further reliance on the government's promises, Mr. Jimenez successfully reapplied for DACA status and work authorization in 2014.

96.      Shortly after receiving DACA status, Mr. Jimenez secured three part-time teaching and mentorship positions, working as a tutor, a sports coach in an after-school program, and as a manager at an adolescent rehabilitation center at night.  After a few months, Mr. Jimenez accepted a full-time position as a program coordinator with the national nonprofit HealthCorps, which enabled him to continue to pursue his interest in teaching and mentorship.

97.      In August 2016, Mr. Jimenez began working as a substitute teacher in the Los Angeles Unified School District.  Mr. Jimenez is now a full-time special education teacher at

Stevenson Middle School, where he helps students with learning disabilities overcome their challenges.

98.    Mr. Jimenez has also pursued coaching as a further means to inspire and uplift young people.  In recent years, Mr. Jimenez has also served as the head junior varsity football coach, the head girls junior varsity soccer coach, and an assistant varsity football coach at Roosevelt High School.  Through coaching, Mr. Jimenez seeks to teach young people skills and lessons that will apply broadly and benefit them throughout their lives.

**President Trump's Statements and Actions Prior to Ending DACA**

99.    The government's decision to end the DACA program was motivated by improper discriminatory intent and animus toward Mexican nationals, individuals of Mexican heritage, and Latinos, who together account for 93 percent of approved DACA applications.

100.    According to USCIS, approximately 79 percent of approved DACA applications through March 31, 2017, have been submitted by Mexican nationals.[38]  No other nationality makes up more than 4 percent of approved DACA applications.[39]  93 percent of approved DACA applications have been submitted by individuals from Latin American countries.[40]

101.    President Trump's statements and actions reflect a pattern of bias against Mexicans and Latinos.  For example, on February 24, 2015, President Trump demanded that Mexico "stop sending criminals over our border."[41]  On March 5, 2015, President Trump tweeted that he "want[ed] nothing to do with Mexico other than to build an impenetrable WALL . . . ."[42]

---

[38]  USCIS, Form I-821D Consideration of Deferred Action for Childhood Arrivals by Fiscal Year, Quarter, Intake, Biometrics and Case Status Fiscal Year 2012-2017 (Mar. 31, 2017), https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_performancedata_fy2017_qtr2.pdf.

[39]  *Id.*

[40]  *Id.*

[41]  Donald J. Trump, Tweet on February 24, 2015 at 4:47 PM.

[42]  Donald J. Trump, Tweet on March 5, 2015 at 4:50 PM.

Gibson, Dunn & Crutcher LLP

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

102.    On June 16, 2015, during his speech launching his presidential campaign, President Trump characterized immigrants from Mexico as criminals, "rapists," and "people that have lots of problems."[43]  President Trump later asserted that these remarks were "100 percent correct."[44]

103.    Three days later, President Trump tweeted that "[d]ruggies, drug dealers, rapists and killers are coming across the southern border," and asked, "When will the U.S. get smart and stop this travesty?"[45]

104.    On August 6, 2015, during the first Republican presidential debate, President Trump said "the Mexican government is much smarter, much sharper, much more cunning.  And they send the bad ones over because they don't want to pay for them, they don't want to take care of them."[46]

105.    On August 21, 2015, two men urinated on a sleeping Latino man and then beat him with a metal pole.  At the police station, they stated "Donald Trump was right; all these illegals need to be deported."  When asked about the incident, President Trump failed to condemn the men, instead stating that they were "passionate."  Specifically, President Trump said, "[i]t would be a shame . . . I will say that people who are following me are very passionate.  They love this country and they want this country to be great again.  They are passionate."[47]

106.    On August 24, 2015, President Trump tweeted, "Jeb Bush is crazy, who cares that he speaks Mexican, this is America, English!!"[48]

---

[43]  Donald J. Trump, Presidential Announcement Speech (June 16, 2015), *available at* http://time.com/3923128/donald-trump-announcement-speech/.

[44]  Sandra Guy, *Trump in Chicago: Says he's '100 percent correct' about Mexicans, blasts U.S. as 'laughingstock' – 'we're all a bunch of clowns'*, Chicago Sun Times (June 24, 2016), http://chicago.suntimes.com/news/trump-in-chicago-says-hes-100-percent-correct-about-mexicans-blasts-u-s-as-laughingstock-were-all-a-bunch-of-clowns/.

[45]  Donald J. Trump, Tweet on June 19, 2015, at 7:22 PM.

[46]  Andrew O'Reilly, *At GOP debate, Trump says 'stupid' U.S. leaders are being duped by Mexico*, Fox News (Aug. 6, 2015), http://www.foxnews.com/politics/2015/08/06/at-republican-debate-trump-says-mexico-is-sending-criminals-because-us.html.

[47]  Adrian Walker, *'Passionate' Trump fans behind homeless man's beating?*, The Boston Globe (Aug. 21, 2015), https://www.bostonglobe.com/metro/2015/08/20/after-two-brothers-allegedly-beat-homeless-man-one-them-admiringly-quote-donald-trump-deporting-illegals/I4NXR3Dr7litLi2NB4f9TN/story.html.

[48]  Donald J. Trump, Tweet on August 24, 2015 at 7:14 PM.

Gibson, Dunn & Crutcher LLP

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

107.     On September 25, 2015, President Trump suggested that the United States would no longer "take care" of "anchor babies" from Mexico.[49]

108.     In May and June 2016, President Trump repeatedly attacked United States District Judge Gonzalo Curiel, asserting that because he was "of Mexican heritage" he had "an absolute" and "inherent conflict of interest" that precluded him from hearing a lawsuit against President Trump's eponymous university.[50]  Speaker of the House Paul Ryan characterized President Trump's comments as "the textbook definition of a racist comment."[51]  Senator Susan Collins similarly asserted that President Trump's "statement that Judge Curiel could not rule fairly because of his Mexican heritage" was "absolutely unacceptable."[52]

109.     On August 31, 2016, President Trump raised concerns about immigrants, saying "we have no idea who these people are, where they come from.  I always say Trojan Horse."[53]

110.     In August 2017, President Trump asserted that a group of white supremacists marching in Charlottesville, Virginia included "some very fine people."[54]  Former Massachusetts Governor Mitt Romney suggested that these comments "caused racists to rejoice,"[55] while Senator Lindsay Graham noted that the President was "now receiving praise from some of the most racist

---

[49]  Donald J. Trump, Speech in Oklahoma City, OK at 41:31-42:30 YouTube (Sept. 25, 2015), https://www.youtube.com/watch?v=2j4bY7NAFww.

[50]  Daniel White, *Donald Trump Ramps Up Attacks Against Judge in Trump University Case*, Time (June 2, 2016), http://time.com/4356045/donald-trump-judge-gonzalo-curiel/.

[51]  Sarah McCammon, *Trump Says Comments About Judge 'Have Been Misconstrued'*, Nat'l Pub. Radio (June 7, 2016), http://www.npr.org/2016/06/07/481013560/ryan-trumps-criticism-of-judge-textbook-definition-of-a-racist-comment.

[52]  Susan Collins, *U.S. Senator Susan Collins' Statement on Donald Trump's Comments on the Judiciary* (June 6, 2016), https://www.collins.senate.gov/newsroom/us-senator-susan-collins%E2%80%99-statement-donald-trump%E2%80%99s-comments-judiciary.

[53]  *Transcript of Donald Trump's Immigration Speech*, N.Y. Times (Sept. 1, 2016), https://www.nytimes.com/2016/09/02/us/politics/transcript-trump-immigration-speech.html?mcubz=0.

[54]  Meghan Keneally, *Trump lashes out at 'alt-left' in Charlottesville, says 'fine people on both sides'*, ABC News (Aug. 15, 2017), http://abcnews.go.com/Politics/trump-lashes-alt-left-charlottesville-fine-people-sides/story?id=49235032.

[55]  Emma Kinery, *Mitt Romney: President Trump's Charlottesville comments 'caused racists to rejoice'*, USA Today (Aug. 18, 2017), https://www.usatoday.com/story/news/politics/onpolitics/2017/08/18/mitt-romney-criticizes-president-trump-charlottesville-statement/579410001/.

and hate-filled individuals and groups in our country."[56] Former Ku Klux Klan leader David Duke thanked President Trump for his "honesty and courage."[57]

111. On August 22, 2017, during a rally in Phoenix, Arizona, President Trump described unauthorized immigrants as "animals" who bring "the drugs, the gangs, the cartels, the crisis of smuggling and trafficking."[58]

112. On August 25, 2017, President Trump pardoned former Maricopa County Sheriff Joseph Arpaio, who had been convicted of criminal contempt by United States District Judge Susan R. Bolton for intentionally disobeying a federal court order to cease targeting Latinos. A comprehensive investigation by the United States Department of Justice found that under Sheriff Arpaio's leadership the Maricopa County Sheriff's Office engaged in a pattern and practice of unconstitutional conduct and violations of federal law based on its blatantly discriminatory practices against Latinos.[59] Among other conclusions, the Justice Department investigation uncovered "a pervasive culture of discriminatory bias against Latinos" and noted that Sheriff Arpaio's officers routinely referred to Latinos as "wetbacks," "Mexican bitches," "fucking Mexicans," and "stupid Mexicans." In pardoning Sheriff Arpaio, President Trump praised him as an "American patriot"[60] and suggested that he was "convicted for doing his job."[61]

---

[56] Eugene Scott & Miranda Green, *Trump, Graham feud over President's Charlottesville response*, CNN Politics (Aug. 17, 2017), http://www.cnn.com/2017/08/16/politics/lindsey-graham-donald-trump-charlottesville/index.html.

[57] Z. Byron Wolf, *Trump's defense of the 'very fine people' at Charlottesville white nationalist march has David Duke gushing*, CNN Politics (Aug. 15, 2017), http://www.cnn.com/2017/08/15/politics/donald-trump-david-duke-charlottesville/index.html.

[58] *President Trump Speaks Live in Phoenix, Arizona with Campaign-Style Rally*, CNN (Aug. 22, 2017), http://www.cnn.com/TRANSCRIPTS/1708/22/cnnt.01.html.

[59] U.S. Dep't of Justice, Office of Pub. Affairs, *Department of Justice Releases Investigative Findings on the Maricopa County Sheriff's Office* (Dec. 15, 2011), https://www.justice.gov/opa/pr/department-justice-releases-investigative-findings-maricopa-county-sheriff-s-office.

[60] Donald J. Trump, Tweet on August 25, 2017, at 7:00 PM.

[61] Julie Hirschfeld Davis & Maggie Haberman, *Trump Pardons Joe Arpaio, Who Became Face of Crackdown on Illegal Immigration*, N.Y. Times (Aug. 25, 2017), https://www.nytimes.com/2017/08/25/us/politics/joe-arpaio-trump-pardon-sheriff-arizona.html.

113.     President Trump's recent comments and actions reflect an ongoing pattern and practice of bias stretching back decades.  In 1973, the United States Department of Justice sued President Trump after a federal investigation found that his company had engaged in systematic racial discrimination.  To settle this lawsuit, President Trump agreed to a settlement in which he promised not to discriminate further against people of color.[62]

**The Termination of the DACA Program**

114.     Throughout the first eight months of 2017, the Trump Administration sent strong signals that Dreamers could and should continue to rely on the government's promises regarding the DACA program.  As noted above, then-Secretary of Homeland Security John D. Kelly specifically exempted DACA from the Administration's broad repeal of other immigration programs, and reaffirmed that DACA status is a "commitment" by the government.[63]  On April 21, 2017, President Trump said that his administration is "not after the dreamers," suggested that "[t]he dreamers should rest easy," and responded to the question of whether "the policy of [his] administration [is] to allow the dreamers to stay," by answering "Yes."[64]

115.     On June 29, 2017, officials from ten states[65] that had previously challenged another deferred action program, Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA"), sent a letter to Attorney General Jeff Sessions, asserting that the DACA

---

[62]  Michael Kranish & Robert O'Harrow, Jr., *Inside the government's racial bias case against Donald Trump's company, and how he fought it*, The Washington Post (Jan. 23, 2016), https://www.washingtonpost.com/politics/inside-the-governments-racial-bias-case-against-donald-trumps-company-and-how-he-fought-it/2016/01/23/fb90163e-bfbe-11e5-bcda-62a36b394160_story.html?utm_term=.b640592cbc5a.

[63]  Secretary Kelly Memo, *supra* note 35; Hesson & Kim, *supra* note 36.

[64]  *Transcript of AP Interview With Trump*, *supra* note 37.

[65]  On September 1, 2017, Tennessee Attorney General Herbert H. Slattery III reversed course and decided Tennessee would not join the suit, citing "a human element to this [issue]" that "should not be ignored."  *See* Letter from Tennessee Attorney General Herbert H. Slattery III to Sens. Lamar Alexander and Bob Corker (Sept. 1, 2017), http://static1.1.sqspcdn.com/static/f/373699/27673058/1504293882007/DACA%2Bletter%2B9-1-2017.pdf.  Attorney General Slattery further acknowledged that DACA recipients "have an appreciation for the opportunities afforded them by our country," and that "[m]any . . . have outstanding accomplishments and laudable ambitions, which if achieved, will be of great benefit and service" to the United States.  *Id.*

Gibson, Dunn & Crutcher LLP

program is unlawful.  The states threatened to challenge DACA in court unless the federal government rescinded the DACA program by September 5, 2017.[66]

116.    On July 21, 2017, attorneys general from twenty states sent a letter to President Trump urging him to maintain DACA and defend the program in court, asserting that the arguments of the states which were threatening to bring suit were "wrong as a matter of law and policy."[67]

117.    On August 31, 2017, hundreds of America's leading business executives sent a letter to President Trump urging him to preserve the DACA program.[68]  The letter explains that "Dreamers are vital to the future of our companies and our economy" and are part of America's "global competitive advantage."[69]

118.    On September 4, 2017, Attorney General Sessions wrote to Acting Secretary of Homeland Security Duke, describing his assessment that "DACA was effectuated by the previous administration through executive action, without proper statutory authority;" that DACA "was an unconstitutional exercise of authority by the Executive Branch;" and that "it is likely that potentially imminent litigation would yield similar results [as the DAPA litigation] with respect to DACA."[70]

119.    On September 5, 2017, Attorney General Sessions announced the government's decision to end the DACA program.  In his remarks, Attorney General Sessions recognized that DACA "essentially provided a legal status for recipients for a renewable two-year term, work authorization and other benefits, including participation in the social security program," but asserted

---

[66]  Letter from Texas Attorney General Ken Paxton, *et al.*, to U.S. Attorney General Jeff Sessions (June 29, 2017), https://www.texasattorneygeneral.gov/files/epress/DACA_letter_6_29_2017.pdf.

[67]  Letter from California Attorney General Xavier Becerra, *et al.*, to President Donald J. Trump (July 21, 2017), https://oag.ca.gov/system/files/attachments/press_releases/7-21-17%20%20Letter%20from%20State%20AGs%20to%20President%20Trump%20re%20DACA.final_.pdf.

[68]  Letter to President Donald J. Trump, *et al.*, (Aug. 31, 2017), https://dreamers.fwd.us/business-leaders.

[69]  *Id.*

[70]  Letter from U.S. Attorney General Jefferson B. Sessions to Acting Secretary of Homeland Security Elaine C. Duke (Sept. 4, 2017), https://www.dhs.gov/sites/default/files/publications/17_0904_DOJ_AG-letter-DACA.pdf.

that the program "is vulnerable to the same legal and constitutional challenges that the courts recognized with respect to the DAPA program."[71]

120.     Attorney General Sessions's comments regarding the legality of the DACA program contradict conclusions previously reached by both the Department of Justice and the Department of Homeland Security.  Specifically, the Department of Justice's Office of Legal Counsel ("OLC") provided a detailed analysis of DAPA in 2014, concluding that DAPA—as well as DACA—was a lawful exercise of the Executive Branch's "discretion to enforce the immigration laws."[72]  More recently, in its brief before the U.S. Supreme Court in *United States v. Texas*, DHS concluded that programs like DACA are "lawful exercise[s]" of the Executive Branch's "broad statutory authority" to administer and enforce the Immigration and Nationality Act, 8 U.S.C. § 1101, *et seq.*[73]

121.     Nonetheless, on the same date as Attorney General Sessions's announcement, Acting Secretary of Homeland Security Duke issued a memorandum formally rescinding the DACA program (the "Rescission Memorandum").[74]  Unlike OLC's 2014 analysis, the Rescission Memorandum provides no reasoned evaluation of the legality and merits of the program.  Instead, it states that the threat of litigation by numerous state attorneys general provoked the decision to terminate DACA.

122.     In addition to the Rescission Memorandum, Secretary Duke also issued an accompanying statement asserting that the government had decided to end DACA rather than "allow the judiciary to *potentially* shut the program down completely and immediately."[75]  Secretary Duke

---

[71]   U.S. Dep't of Justice, Office of Pub. Affairs, *Attorney General Sessions Delivers Remarks on DACA* (Sept. 5, 2017), https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-daca.

[72]   Dep't of Homeland Sec.'s Auth. to Prioritize Removal of Certain Aliens Unlawfully Present in the U.S. & to Defer Removal of Others, 2014 WL 10788677 (Op. O.L.C. Nov. 19, 2014).

[73]   *See* Brief for Petitioners at 42, *United States v. Texas*, 136 S. Ct. 2271 (2016) (No. 15-674), 2016 WL 836758 at *42.

[74]   Memorandum from Acting Secretary Elaine C. Duke, Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (Sept. 5, 2017), https://www.dhs.gov/news/2017/09/05/memorandum-rescission-daca.

[75]   Statement from Acting Secretary Duke on the Rescission Of Deferred Action For Childhood Arrivals (DACA) (Sept. 5, 2017), https://www.dhs.gov/news/2017/09/05/statement-acting-secretary-duke-rescission-deferred-action-childhood-arrivals-daca (emphasis added).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

also expressed "sympath[y]" and "frustrat[ion]" on "behalf" of DACA recipients, candidly

acknowledging that "DACA was fundamentally a lie."[76]

123.     Under the Rescission Memorandum, the federal government will continue to

process DACA applications received by September 5, 2017.  Furthermore, the federal government

will issue renewals for recipients whose permits expire before March 5, 2018, provided they apply

for renewal by October 5, 2017.  The government will not approve any new or pending applications

for advanced parole.

124.     In a statement also issued on September 5, 2017, President Trump claimed that he

decided to end DACA because he had been advised that "the program is unlawful and

unconstitutional and cannot be successfully defended in court," and because DACA "helped spur a

humanitarian crisis—the massive surge of unaccompanied minors from Central America including,

in some cases, young people who would become members of violent gangs throughout our country,

such as MS-13."[77]

125.     The government also has taken affirmative steps to reduce the protections applicable

to information provided in connection with the DACA program.  In January 2017, President Trump

issued an Executive Order directing all agencies, including DHS, to "ensure that their privacy

policies exclude persons who are not United States citizens or lawful permanent residents from the

protections of the Privacy Act regarding personally identifiable information."[78]  DHS has confirmed

that its new privacy policy "permits the sharing of information about immigrants and non-

immigrants with federal, state, and local law enforcement."[79]

---

[76]  *Id.*

[77]  Statement from President Donald J. Trump (Sept. 5, 2017), https://www.whitehouse.gov/the-press-office/2017/09/05/statement-president-donald-j-trump.

[78]  Exec. Order No. 13768, "Enhancing Public Safety in the Interior of the United States" (Jan. 25, 2017), https://www.whitehouse.gov/the-press-office/2017/01/25/presidential-executive-order-enhancing-public-safety-interior-united.

[79]  DHS, Privacy Policy 2017-01 Questions & Answers, at 3 (Apr. 27, 2017), https://www.dhs.gov/sites/default/files/publications/Privacy%20Policy%20Questions%20%20Answers%2C%2020170427%2C%20Final.pdf.

126.     The Rescission Memorandum also provides no assurance that information provided in connection with DACA applications or renewal requests will not be used for immigration enforcement purposes.  To the contrary, DHS posted public guidance about the impact of the rescission on the same day that the Rescission Memorandum was issued.  This guidance backtracks on the government's prior repeated assurances that "[i]nformation provided in [a DACA] request *is protected from disclosure* to ICE and CBP for the purpose of immigration enforcement proceedings . . . ."[80]  Now, rather than affirmatively "protect[ing] [this information] from disclosure," the government represents only that such sensitive information "***will not be proactively provided*** to ICE and CBP for the purpose of immigration enforcement proceedings . . . ."[81]  And even this policy "may not be relied upon" by any party and can be changed "at any time without notice."[82]

127.     Despite terminating DACA, other uses of deferred action and programs benefitting other groups of immigrants remain in effect.

**The Termination of the DACA Program Will Inflict Severe Harm**

128.     The termination of the DACA program will severely harm Plaintiffs and hundreds of thousands of other young Dreamers.  Among other things, Plaintiffs stand to lose their ability to access numerous federal, state, and practical benefits, and to reside in the United States with their families.  Nearly 800,000 other young people will similarly face the prospect of losing their jobs, being denied vital benefits, and being separated from the family, friends, colleagues, and communities that love and rely on them.  The termination of the DACA program will also harm the students, patients, clients, community members, family, and friends who have come to rely on Plaintiffs for essential services and emotional and financial support.

---

[80]  USCIS DACA FAQs, Question 19 (emphasis added).  The referenced Notice to Appearance guidance is USCIS Policy Memorandum 602-0050 (Nov. 7, 2011) ("Revised Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Removable Aliens").

[81]  DHS, *Frequently Asked Questions: Rescission of Deferred Action for Childhood Arrivals (DACA)* (Sept. 5, 2017) (emphasis added), https://www.dhs.gov/news/2017/09/05/frequently-asked-questions-rescission-deferred-action-childhood-arrivals-daca.

[82]  *Id.*

129.     With the sensitive personal information they provided to the federal government no longer "protected from disclosure," Plaintiffs and other DACA recipients face the imminent risk that such information could be used against them "at any time," "without notice," for purposes of immigration enforcement, including detention or deportation.

130.     Terminating DACA will also cause widespread economic harm.[83]  DACA has enabled approximately 800,000 hardworking, ambitious, and educated young people to enter the labor force.  Over 90 percent of DACA recipients are employed, and over 95 percent are bilingual, a valuable skill that is increasingly needed by American companies.[84]

131.     Terminating the DACA program will also have a negative impact on the economy and American competitiveness.[85]

132.     On August 31, 2017, in recognition of these costs and their concern for Dreamers, hundreds of America's most important business leaders sent a letter to President Trump emphasizing the benefits of the DACA program and urging him to preserve it.  The letter explains that "Dreamers are vital to the future of our companies and our economy" and part of America's "global competitive advantage."[86]

## CAUSES OF ACTION

## FIRST COUNT

## FIFTH AMENDMENT – DUE PROCESS

133.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

---

[83]  *See, e.g.*, Ike Brannon & Logan Albright, The Economic and Fiscal Impact of Repealing DACA, The Cato Institute (Jan. 18, 2017), https://www.cato.org/blog/economic-fiscal-impact-repealing-daca; Immigrant Legal Resource Center, Money on the Table: The Economic Cost of Ending DACA (Dec. 2016), https://www.ilrc.org/sites/default/files/resources/2016-12-13_ilrc_report_-_money_on_the_table_economic_costs_of_ending_daca.pdf.

[84]  *Id.*

[85]  *See* Ike Brannon & Logan Albright, *supra* note 83 (concluding that terminating DACA will cost the federal government $60 billion in lost revenue and reduce GDP by $215 billion).

[86]  Letter to President Donald J. Trump, Speaker Paul Ryan, Leader Nancy Pelosi, Leader Mitch McConnell, and Leader Charles E. Schumer (Aug. 31, 2017), https://dreamers.fwd.us/business-leaders.

Gibson, Dunn & Crutcher LLP

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    134.    Immigrants who are physically present in the United States are guaranteed the

2    protections of the Due Process Clause.  *See Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

3    135.    The Constitution "imposes constraints on governmental decisions which deprive

4    individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the

5    Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).  A threshold

6    inquiry in any case involving a violation of procedural due process "is whether the plaintiffs have a

7    protected property or liberty interest and, if so, the extent or scope of that interest." *Nozzi v. Hous.*

8    *Auth. of L.A.*, 806 F.3d 1178, 1190–91 (9th Cir. 2015) (citing *Bd. of Regents of State Colls. v. Roth*,

9    408 U.S. 564, 569–70 (1972)).

10    136.    The property interests protected by the Due Process Clause "extend beyond tangible

11    property and include anything to which a plaintiff has a 'legitimate claim of entitlement.'" *Nozzi*,

12    806 F.3d at 1191 (quoting *Roth*, 408 U.S. at 576–77).  "A legitimate claim of entitlement is created

13    [by] . . . 'rules or understandings that secure certain benefits and that support claims of entitlement to

14    those benefits.'" *Id.* (quoting *Roth*, 408 U.S. at 577).

15    137.    In addition to freedom from detention, *Zadvydas*, 533 U.S. at 690, the term "liberty"

16    also encompasses the ability to work, raise a family, and "form the other enduring attachments of

17    normal life." *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972) (citing *Roth*, 408 U.S. at 572).

18    138.    DACA recipients, including Plaintiffs, have constitutionally protected liberty and

19    property interests in their DACA status and the numerous benefits conferred thereunder, including

20    the ability to renew their DACA status every two years.  These protected interests exist by virtue of

21    the government's decision to grant DACA recipients certain benefits and its repeated representations

22    and promises regarding the DACA program.  *See Goldberg v. Kelly*, 397 U.S. 254, 262 (1970); *Perry*

23    *v. Sindermann*, 408 U.S. 593, 601 (1972) ("A person's interest in a benefit is a 'property' interest for

24    due process purposes if there are such rules or mutually explicit understandings that support his claim

25    of entitlement to the benefit and that he may invoke at a hearing.").

26    139.    In establishing and continuously operating DACA under a well-defined framework

27    of highly specific criteria—including nearly 150 pages of specific instructions for managing the

28    program—the government created a reasonable expectation among Plaintiffs and other DACA

Gibson, Dunn &
Crutcher LLP

recipients that they are entitled to the benefits provided under the program, including the ability to seek renewal of their DACA status, as long as they continue to play by the rules and meet the program's nondiscretionary criteria for renewal.

140.     DACA status is uniquely valuable to Plaintiffs and other Dreamers in that it serves as a gateway to numerous essential benefits.  Revocation of DACA effectively deprives these young people of the ability to be fully contributing members of society.

141.     The ability to renew DACA status at regular intervals has always been an essential element of the program and part of the deal offered by the government.  The prospect of renewal was one of the primary benefits the government used to induce Plaintiffs and other Dreamers to step forward, disclose highly sensitive personal information, and subject themselves to a rigorous background investigation.

142.     The government's arbitrary termination of the DACA program and deprivation of the opportunity to renew DACA status violates the due process rights of Plaintiffs and other DACA recipients.

143.     The government's decision to terminate DACA after vigorously promoting the program and coaxing hundreds of thousands of highly vulnerable young people to step forward is an unconstitutional bait-and-switch.  *See, e.g.*, *Cox v. State of La.*, 379 U.S. 559, 571 (1965); *Raley v. State of Ohio*, 360 U.S. 423, 438–39 (1959).  The government promised Plaintiffs and other young people that if they disclosed highly sensitive personal information, passed a background check, and played by the rules, they would be able to live and work in the United States.  The government's termination of the DACA program is a breach of that promise.  For the government to now "say . . . 'The joke is on you.  You shouldn't have trusted us,' is hardly worthy of our great government." *Moda Health Plan, Inc. v. United States*, 130 Fed. Cl. 436, 466 (Fed. Cl. 2017) (quoting *Brandt v. Hickel*, 427 F.2d 53, 57 (9th Cir. 1970)).

144.     The Due Process Clause also forbids the government from breaking its promises, especially where, as here, individuals have been induced to undertake actions with potentially devastating consequences in reliance on those promises.

145.     The use of information provided by Plaintiffs and other DACA applicants for immigration enforcement actions has particularly egregious due process implications.  These individuals disclosed sensitive personal information in reliance on the government's explicit and repeated assurances that it would not be used for immigration enforcement purposes and would in fact be "protected from disclosure" to ICE and CBP.  The government has already violated its promises regarding DACA, and there is little reason to believe it will not similarly breach its representations regarding information sharing.  *Cf. Raley*, 360 U.S. at 438 ("convicting a citizen for exercising a privilege which the State clearly had told him was available to him," was the "most indefensible sort of entrapment by the State").  Indeed, the government already has breached its prior commitments to affirmatively "protect[] [sensitive information] from disclosure," now asserting only that it will not "proactively provide[]" such information to ICE and CBP for the purpose of immigration enforcement proceedings.

146.     The Due Process Clause also requires that the federal government's immigration enforcement actions be fundamentally fair.  Here, the government's arbitrary decisions to terminate DACA and change the policy regarding the use of information provided by DACA applicants are fundamentally unfair.

147.     Defendants' violations of the Due Process Clause have harmed Plaintiffs and will continue to cause ongoing harm to Plaintiffs.

## SECOND COUNT

## FIFTH AMENDMENT – EQUAL PROTECTION

148.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

149.     The Fifth Amendment forbids federal officials from acting with a discriminatory intent or purpose.  *See United States v. Windsor*, 133 S. Ct. 2675, 2695 (2013); *Bolling v. Sharpe*, 347 U.S. 497, 500 (1954).

150.     To succeed on an equal protection claim, plaintiffs must show that the defendants "discriminated against them as members of an identifiable class and that the discrimination was intentional."  *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1134 (9th Cir. 2003) (citation

omitted).  "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."  *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).  "The court analyzes whether a discriminatory purpose motivated the defendant by examining the events leading up to the challenged decision and the legislative history behind it, the defendant's departure from normal procedures or substantive conclusions, and the historical background of the decision and whether it creates a disparate impact."  *Avenue 6E Invs., LLC v. City of Yuma, Ariz.*, 818 F.3d 493, 504 (9th Cir. 2016).

151.  As set forth above, the termination of DACA was motivated by improper discriminatory intent and bias against Mexican nationals, individuals of Mexican descent, and Latinos, who together account for 93 percent of approved DACA applications.

152.  President Trump has a history of tweets, campaign speeches, debate responses, and other statements alleging that Mexican and Latino immigrants are rapists, criminals, and otherwise bad people.  Moreover, shortly before terminating DACA, President Trump pardoned former Maricopa County Sheriff Joe Arpaio for a criminal contempt of court conviction related to Sheriff Arpaio's discriminatory practices against Latinos, asserting that the Sheriff had been convicted of contempt merely for "doing his job."

153.  President Trump's statements and actions, including the termination of the DACA program, appealed to voters who harbor hostility toward Mexican and Latino immigrants.

154.  The government did not follow its normal procedures in reversing course and terminating the DACA program.  In 2014, the OLC concluded, after conducting a detailed analysis, that DACA was a lawful exercise of the Executive Branch's discretion.  The government has made similar arguments to the Supreme Court.  By contrast, Attorney General Sessions's one-page letter to Acting Secretary Duke contained virtually no legal analysis, and Acting Secretary Duke's Rescission Memorandum relied largely on Attorney General Sessions's letter.

155.  There are many strong policy reasons to maintain the DACA program.  DACA has provided the government with enormous benefits, including an efficient allocation of immigration enforcement resources.  DACA has also provided enormous benefits to American businesses and the

Gibson, Dunn & Crutcher LLP

broader economy.  And DACA has helped communities throughout the United States, who are able to benefit from the talents and contributions of DACA recipients.

156.     DACA is a promise from the government to DACA recipients and those who rely on them.  Separate from the policy rationales set forth above, the government is obligated to honor its commitments under the DACA program.

157.     The government continues to operate programs that benefit other groups of immigrants.  Because Mexicans and Latinos account for 93 percent of approved DACA applications, they will be disproportionately impacted by the termination of the DACA program.

158.     The history, procedure, substance, context, and impact of the decision to terminate DACA demonstrate that the decision was motivated by discriminatory animus against Mexican and Latino immigrants.  Because it was motivated by a discriminatory purpose, the decision to terminate DACA violates the equal protection guarantee of the Due Process Clause of the Fifth Amendment.

159.     Defendants' violations have caused ongoing harm to Plaintiffs and other Dreamers.

### THIRD COUNT

### ADMINISTRATIVE PROCEDURE ACT – CONSTITUTIONAL VIOLATIONS

160.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

161.     Defendants are subject to the Administrative Procedure Act ("APA").  *See* 5 U.S.C. § 703.  The termination of the DACA program is final agency action subject to judicial review because it marks the "consummation of the . . . decisionmaking process" and is one "from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotation marks omitted).

162.     The  "comprehensive" scope of the APA provides a "default" "remed[y] for all interactions between individuals and all federal agencies."  *W. Radio Servs. Co. v. U.S. Forest Serv.*, 578 F.3d 1116, 1123 (9th Cir. 2009).

163.     The APA requires that courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law . . . [or] contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(A), (B).

164.     For the reasons set forth above, the decision to terminate the DACA program is unconstitutional in numerous respects and therefore must be vacated.

## FOURTH COUNT

## ADMINISTRATIVE PROCEDURE ACT – ARBITRARY AND CAPRICIOUS ACTION

165.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

166.     Defendants are subject to the APA.  *See* 5 U.S.C. § 703.  The termination of the DACA program is final agency action subject to judicial review because it marks the "consummation of the . . . decisionmaking process" and is one "from which legal consequences will flow." *Bennett*, 520 U.S. at 178 (internal quotation marks omitted).

167.     The "comprehensive" scope of the APA provides a "default" "remed[y] for all interactions between individuals and all federal agencies." *W. Radio Servs. Co.*, 578 F.3d at 1123.

168.     The APA requires that courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (E).

169.     In creating DACA, the government promised Plaintiffs that if they stepped forward, shared highly sensitive personal information, and passed a background check, they would be granted renewable protection and would be allowed to live and work in the United States as long as they played by the rules.  The government also specifically and consistently promised that information disclosed through the DACA program would not be used for immigration enforcement purposes outside certain limited circumstances.

170.     Plaintiffs and nearly 800,000 vulnerable young people reasonably relied on the government's assurances and promises in taking the irreversible step of identifying themselves and providing the government with highly sensitive and potentially compromising personal information. DACA recipients also made numerous life-altering personal and professional decisions in reliance on the government's promises regarding DACA.

Gibson, Dunn &
Crutcher LLP

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
38

171.     A government decision reversing a prior policy is "arbitrary and capricious" when it fails "tak[e] into account" these types of "serious reliance interests." *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1209 (2015).

172.     The government's disregard for the reasonable reliance of Plaintiffs and hundreds of thousands of other vulnerable young people is the hallmark of arbitrary and capricious action and an abuse of discretion, and the decision to terminate the DACA program is therefore in violation of the APA and must be vacated.

173.     The government's decision to terminate the DACA program is also arbitrary and capricious because the purported rationale for that decision is inconsistent with DHS's new policy. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 55–56 (1983) (holding that the agency "failed to offer the rational connection between facts and judgment required to pass muster under the arbitrary capricious standard"). In particular, the government terminated DACA because it purportedly concluded that the Executive Branch lacks authority to continue the program, yet DHS will continue to adjudicate pending DACA applications, as well as renewal applications it receives before October 5, 2017 (for individuals whose benefits expire before March 5, 2018), thereby extending DACA for an additional two and a half years.

174.     The government's decision to set an October 5, 2017 deadline for accepting DACA renewal applications is also arbitrary. The Rescission Memorandum does not provide a reasoned analysis to support this short deadline, and the government has failed to provide sufficient time and notice to DACA recipients. On information and belief, the government has sent false and misleading renewal notices to certain DACA recipients, which have failed to advise them of the October 5, 2017 deadline. Moreover, this short deadline is especially troubling for low-income DACA recipients, who have little time to gather the significant funds required to submit a DACA renewal application.

175.     Moreover, the decision to terminate DACA is also arbitrary and capricious because the government itself previously determined that DACA is a lawful exercise of the Executive Branch's immigration enforcement authority, and the government failed to conduct or provide a reasoned analysis for its change of policy. *See Nat'l Wildlife Fed'n v. Burford*, 871 F.2d 849, 855 (9th Cir. 1989) ("a shift from settled policy requires a showing of reasoned analysis").

Gibson, Dunn & Crutcher LLP

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

176.     The government's decision to terminate DACA is also in violation of the APA because the stated rationale for ending the program is pretextual and incorrect as a matter of law.

### FIFTH COUNT

### ADMINISTRATIVE PROCEDURE ACT – NOTICE-AND-COMMENT RULEMAKING

177.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

178.     The APA, 5 U.S.C. §§ 553 and 706(2)(D), requires that federal agencies conduct rulemaking before engaging in action that impacts substantive rights.

179.     DHS is an "agency" under the APA, and the Rescission Memorandum and the actions that DHS has taken to implement the Rescission Memorandum are "rules" under the APA. *See* 5 U.S.C. § 551(1), (4).

180.     In implementing the Rescission Memorandum, federal agencies have changed the substantive criteria by which individual DACA grantees work, live, attend school, obtain credit, and travel in the United States.  Defendants did not follow the procedures required by the APA before taking action impacting these substantive rights.

181.     With exceptions that are not applicable here, agency rules must go through notice-and-comment rulemaking.  *See* 5 U.S.C. § 553.

182.     Defendants promulgated and implemented these rules without authority and without notice-and-comment rulemaking in violation of the APA.

183.     Plaintiffs will be impacted because they have not had the opportunity to comment on the rescission of DACA.

184.     Defendants' violation has caused ongoing harm to Plaintiffs and other Dreamers.

### SIXTH COUNT

### REGULATORY FLEXIBILITY ACT – REGULATORY FLEXIBILITY ANALYSES

185.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

Gibson, Dunn &
Crutcher LLP

186.     The Regulatory Flexibility Act, 5 U.S.C. §§ 601–12 ("RFA"), requires federal agencies to analyze the impact of rules they promulgate on small entities and publish initial and final versions of those analyses for public comment.  5 U.S.C. §§ 603–04.

187.     "Small entit[ies]" for purposes of the RFA includes "small organization[s]" and "small business[es]."  *See* 5 U.S.C. §§ 601(3), (4), (6).

188.     The actions that DHS has taken to implement the DHS Memorandum are "rules" under the RFA.  *See* 5 U.S.C. § 601(2).

189.     Defendants have not issued the required analyses of DHS's new rules.

190.     Defendants' failure to issue the initial and final Regulatory Flexibility Analyses violates the RFA and is unlawful.

191.     Defendants' violations cause ongoing harm to Plaintiffs and other Dreamers.

**SEVENTH COUNT**

**EQUITABLE ESTOPPEL**

192.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

193.     Through its conduct and statements, the government represented to Plaintiffs and other DACA applicants that DACA was lawful and that information collected in connection with the DACA program would not be used for immigration enforcement purposes absent special circumstances.

194.     In reliance on the government's repeated assurances, Plaintiffs and other DACA applicants risked removal and deportation and came forward and identified themselves to the government, and provided sensitive personal information, including their fingerprints and personal history, in order to participate in DACA.

195.     Throughout the life of DACA, the government has continued to make affirmative representations about the use of information as well as the validity and legality of DACA.  Plaintiffs and other DACA applicants relied on the government's continuing representations to their detriment.

Gibson, Dunn & Crutcher LLP

196.     DACA beneficiaries rearranged their lives to become fully visible and contributing members of society, including by seeking employment, pursuing higher education, and paying taxes, but are now at real risk of removal and deportation.

197.     Accordingly, Defendants should be equitably estopped from terminating the DACA program or from using information provided pursuant to DACA for immigration enforcement purposes, except as previously authorized under DACA.

198.     An actual controversy between Plaintiffs and Defendants exists as to whether Defendants should be equitably estopped.

199.     Plaintiffs are entitled to a declaration that Defendants are equitably estopped.

**EIGHTH COUNT**

**DECLARATORY JUDGMENT THAT DACA IS LAWFUL**

200.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

201.     The DACA program was a lawful exercise of the Executive Branch's discretion to enforce the immigration laws.  Indeed, after performing a thorough analysis, the government itself concluded that DACA was lawful.[87]  However, the government now claims, as the basis for its rescission of the program, that DACA is unlawful.[88]

202.     The Declaratory Judgment Act, 28 U.S.C. § 2201, allows the court, "[i]n a case of actual controversy within its jurisdiction," to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

203.     As DACA beneficiaries, Plaintiffs have an interest in the legality of the DACA program.  The government's decision to terminate DACA on the purported basis that the DACA program was unlawful has harmed Plaintiffs and continues to cause ongoing harm to Plaintiffs.

---

[87]  *See* Dep't of Homeland Sec.'s Auth. to Prioritize Removal of Certain Aliens Unlawfully Present in the U.S. & to Defer Removal of Others, 2014 WL 10788677 (Op. O.L.C. Nov. 19, 2014).

[88]  *See* Memorandum from Acting Secretary Elaine C. Duke, Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (Sept. 5, 2017), https://www.dhs.gov/news/2017/09/05/memorandum-rescission-daca.

Gibson, Dunn & Crutcher LLP

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    204.    There is an actual controversy regarding whether the DACA program is lawful.

2    205.    Plaintiffs are entitled to a declaratory judgment pursuant to 28 U.S.C. § 2201(a) that

3    the DACA program was lawful and is lawful today.

4    ### PRAYER FOR RELIEF

5    WHEREFORE, Plaintiffs pray that this Court grant the following relief:

6    (1)    Issue a declaratory judgment pursuant to 28 U.S.C. § 2201(a) that the DACA program is

7    lawful and constitutional;

8    (2)    Issue a declaratory judgment pursuant to 28 U.S.C. § 2201(a) and 5 U.S.C. § 706(2) that

9    the termination of the DACA program was unlawful and unconstitutional;

10    (3)    Issue a declaratory judgment pursuant to 28 U.S.C. § 2201(a) that Defendants are

11    equitably estopped from terminating the DACA program or from using information

12    provided pursuant to DACA for immigration enforcement purposes, except as previously

13    authorized under the program;

14    (4)    Issue an injunction invalidating the Rescission Memorandum, preserving the status quo,

15    and enjoining Defendants from terminating the DACA program;

16    (5)    Issue an injunction enjoining Defendants from sharing or otherwise using information

17    provided pursuant to the DACA program for immigration enforcement purposes except as

18    previously authorized under the DACA program; and

19    (6)    Grant any other and further relief that this Court may deem just and proper.

20

21    DATED:  September 18, 2017          Respectfully submitted,
     San Francisco, California

22                                       /s/ Theodore J. Boutrous, Jr.
                                         GIBSON, DUNN & CRUTCHER LLP

23

24                                       /s/ Mark D. Rosenbaum
                                         PUBLIC COUNSEL

25

26                                       /s/ Luis Cortes Romero
                                         BARRERA LEGAL GROUP, PLLC

27

28                                       /s/ Laurence H. Tribe

1

2                                        /s/ Erwin Chemerinsky

3                                        /s/ Leah Litman

4

5                                        Attorneys for Plaintiffs DULCE GARCIA,
                                         MIRIAM GONZALEZ AVILA, SAUL JIMENEZ
6                                        SUAREZ, VIRIDIANA CHABOLLA MENDOZ
                                         NORMA RAMIREZ, and JIRAYUT
7                                        LATTHIVONGSKORN

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28