GIBSON, DUNN & CRUTCHER LLP
THEODORE J. BOUTROUS, JR., SBN 132099
    tboutrous@gibsondunn.com
ETHAN D. DETTMER, SBN 196046
    edettmer@gibsondunn.com
JONATHAN N. SOLEIMANI, SBN 295673
    jsoleimani@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520

MATTHEW S. ROZEN, *pro hac vice* forthcoming
    mrozen@gibsondunn.com
SURIA M. BAHADUE, *pro hac vice* forthcoming
    sbahadue@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: (202) 955-8500
Facsimile: (202) 467-0539

PUBLIC COUNSEL
MARK D. ROSENBAUM, SBN 59940
    mrosenbaum@publiccounsel.org
JUDY LONDON, SBN 149431
    jlondon@publiccounsel.org
610 South Ardmore Avenue
Los Angeles, CA 90005
Telephone: (213) 385-2977
Facsimile: (213) 385-9089

BARRERA LEGAL GROUP, PLLC
LUIS CORTES ROMERO, SBN 310852
    lcortes@barreralegal.com
19309 68th Avenue South, Suite R102
Kent, WA 98032
Telephone: (253) 872-4730
Facsimile: (253) 237-1591

*Attorneys for Plaintiffs*
[Additional Counsel Listed on Next Page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| DULCE GARCIA; MIRIAM GONZALEZ AVILA; SAUL JIMENEZ SUAREZ; NORMA RAMIREZ; JIRAYUT LATTHIVONGSKORN; MARCO ANTONIO SALINAS MUNOZ; DULCE BERENICE VARGAS BALTAZAR; ERICKA LISSETH DANIEL SANTELLAN; GRISEL GUADALUPE CHAVEZ DIAZ; and FELIPE ALVAREZ CARRILLO,<br><br>       Plaintiffs,<br><br>       v.<br><br>UNITED STATES OF AMERICA; U.S. DEPARTMENT OF HOMELAND SECURITY; CHAD F. WOLF, in his official capacity as purported Acting Secretary of Homeland Security and as Under Secretary of Homeland Security for Strategy, Policy, and Planning; JOSEPH EDLOW, in his official capacity as purported DHS Deputy Director of Policy; and UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES,<br><br>       Defendants. | CIVIL CASE NO.: 3:17-CV-05380-WHA<br><br>**FIRST AMENDED COMPLAINT** |

*Additional Counsel for Plaintiffs*

LAURENCE H. TRIBE, SBN 39441
    larry@tribelaw.com
Harvard Law School*
*Affiliation for identification purposes only*
1575 Massachusetts Avenue
Cambridge, MA 02138
Telephone: (617) 495-1767

ERWIN CHEMERINSKY, *pro hac vice* forthcoming
    echemerinsky@law.berkeley.edu
University of California, Berkeley School of Law*
*Affiliation for identification purposes only*
215 Boalt Hall
Berkeley, CA 94720-7200
Telephone: (510) 642-6483

FIRST AMENDED COMPLAINT
CIVIL CASE NO.: 3:17-CV-05380-WHA

**INTRODUCTION**

On June 18, 2020, the Supreme Court issued its historic decision rejecting the Trump Administration's effort to rescind the Deferred Action for Childhood Arrivals ("DACA") program. *DHS v. Regents of the Univ. of Cal. ("Regents III")*, 140 S. Ct. 1891 (2020).  The Supreme Court held that Acting Secretary of Homeland Security Elaine C. Duke's September 5, 2017 memorandum terminating DACA (the "Duke Memorandum") was subject to judicial review under the Administrative Procedure Act ("APA") and was arbitrary and capricious in violation of that statute because it failed to consider important aspects of the decision to end DACA.  As a result of the Supreme Court's decision, the Duke Memorandum was vacated and the DACA program was reinstated as a matter of law, protecting the benefits of DACA for nearly 700,000 current DACA recipients that have relied on the program for years to live and work in the United States without fear of deportation.  Reinstating DACA also restored critical aspects of the program that had been unavailable during the prior nearly three years of litigation, including the right of approximately 300,000 eligible individuals to apply for DACA for the first time, and the ability of current and aspiring DACA recipients to request advance parole to travel abroad and return to the United States without penalty.

In practice, however, full reinstatement of the program never happened.  During the course of the litigation, President Trump had purported to install a series of officials as Acting Secretary of Homeland Security to fill the still-ongoing vacancy left by Secretary Kirstjen Nielsen's departure in April 2019.  On July 28, 2020, on the heels of the Supreme Court victory, as Dreamers were filling out first-time applications and requests for advance parole that they had waited years for the opportunity to file, the latest of these officials, Defendant Chad F. Wolf, issued a memorandum (the "Wolf Memorandum") purporting to drastically cut back the program.[1]  The Wolf Memorandum declared a moratorium on first-time DACA applications and requests for advance parole, and halved the period of relief available to existing DACA recipients applying for renewal, requiring recipients to file a new renewal application—and pay a new application fee—every year rather than every two years.

---

[1] Memorandum from Acting Secretary Chad Wolf, *Reconsideration of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children"* (July 28, 2020), https://www.dhs.gov/sites/default/files/publications/20_0728_s1_daca-reconsideration-memo.pdf.

Gibson, Dunn &
Crutcher LLP

The government maintains that Defendant Wolf was authorized to modify DACA because he assumed the office of the Acting Secretary of Homeland Security pursuant to the Homeland Security Act ("HSA"), 6 U.S.C. § 113(g)—a DHS-specific succession statute—upon his appointment and Senate confirmation as Under Secretary of Homeland Security for Strategy, Policy, and Plans.[2]  While most federal vacancy appointments are governed by the Federal Vacancies Reform Act of 1998 ("FVRA"), 5 U.S.C. § 3345 *et seq.*, which grants the President authority to fill vacancies in most federal offices on a time-limited basis, Congress enacted a separate succession statute for the Department of Homeland Security ("DHS") that specifies an initial succession order for the Secretary and empowers the Secretary to name additional officers in further order of succession, *see* 6 U.S.C. § 113(g).  It is undisputed that the succession orders operative throughout the vast majority of Secretary Nielsen's tenure in office do not authorize the Under Secretary for Strategy, Policy, and Plans to serve as Acting Secretary in the present circumstances.[3]  The government's view, however, is that in the closing days of her tenure, former Secretary Nielsen modified the succession order, allowing then-Commissioner of Customs and Border Protection Kevin McAleenan to assume the office of Acting Secretary upon Secretary Nielsen's departure.  McAleenan then purported to further modify the succession order to the present version, under which Defendant Wolf, as Under Secretary for Strategy, Policy, and Plans, is now next in line following McAleenan's departure.[4]

The government's story deliberately distorts and then misrepresents the actual facts on the ground.  As at least one court and the Government Accountability Office have recognized, former Secretary Nielsen did not modify the operative succession order.  She modified a separate succession order applicable when the Secretary is unavailable due to disaster or catastrophic emergency, but not the relevant succession order applicable in case of resignation.[5]  As a result, McAleenan never lawfully

---

[2]  *See* GAO, *Matter of Department of Homeland Security – Legality of Service of Acting Secretary of Homeland Security and Service of Senior Official Performing the Duties of Deputy Secretary of Homeland Security*, B-331650, at 8 (Aug. 14, 2020) ("GAO Report"), *available at* https://www.gao.gov/assets/710/708830.pdf.

[3]  DHS*, Orders of Succession and Delegations of Authorities for Named Positions*, Delegation No. 00106, Revision No. 08.5 (Dec. 15, 2016) ("Delegation Order 00106").

[4]  GAO Report, at 8.

[5]  *See Casa de Md., Inc. v. Wolf ("Casa III")*, -- F. Supp. 3d --, 2020 WL 5500165, at *21-22 (D. Md. Sept. 11, 2020); GAO Report, at 9.

succeeded former Secretary Nielsen as Acting Secretary and had no authority to further modify the succession order to the current form on which Defendant Wolf's purported appointment relies. As Chief Justice Roberts recognized in *Regents III*, in circumstances like these, strict adherence to settled rules matters—that where lives and livelihoods are the stakes the government must "'turn square corners.'" *Regents III*, 140 S. Ct. at 1909. Even as to the straightforward requirements for appointment of the head of DHS prior to issuance of any directives, the Administration did anything but.

More fundamentally, even if former Secretary Nielsen and McAleenan *had* effectively modified the succession order, Defendant Wolf would still lack authority to serve as Acting Secretary for an additional, independent reason: He was not appointed to that office in a manner permitted by the Appointments Clause. Article II of the Constitution carefully guards the awesome powers of the federal government by limiting the authority to appoint federal officers to those "accountable to political force and the will of the people." *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 884 (1991). The Appointments Clause thus authorizes only two constitutionally permissible methods for appointing federal officers: (1) by the President with advice and consent of the Senate; and (2) by the President, the courts, and heads of executive departments, as authorized by statute. *See* U.S. Const. art. II, § 2. "Principal" officers must be appointed by the first method, while "inferior" officers can be appointed by either method. *See Edmond v. United States*, 520 U.S. 651, 660 (1997). The Appointments Clause thus ensures democratic accountability by preserving a joint role for elected legislative and executive officials in all appointments: The President can only appoint officers with the advice and consent of the Senate or authorization by Congress, and the only other officers that Congress can vest with the appointment power—"judges" and "heads of departments"—are "principal federal officers" that must be appointed by the President with the Senate's advice and consent. *Freytag*, 501 U.S. at 884.

"[B]ecause of the temporary nature of the office," "acting heads of department" are sometimes considered "inferior officer[s]" who may be appointed by either method. *United States v. Smith*, 962 F.3d 755, 765 (4th Cir. 2020). But even an acting department head must be appointed to that office by someone vested with the appointment power. Thus, even if Defendant Wolf can be said to be acting as an inferior officer in exercising the Secretary's powers on a temporary basis, he still must have been appointed Acting Secretary by the President, the courts, or the head of an executive department.

Defendant Wolf was never appointed as Acting Secretary by any of these methods. Indeed, he was never appointed to that role by anyone. President Trump picked him for the role by Twitter post,[6] and Defendant Wolf purported to assume the role by virtue of the succession order promulgated by his immediate predecessor, Acting Secretary McAleenan. Even if that succession order could be considered an appointment of Defendant Wolf by Acting Secretary McAleenan, McAleenan was not— and was never Senate confirmed as—the actual head (Secretary) of the DHS. He merely served as *Acting* Secretary pursuant to a temporary appointment as an inferior officer by Secretary Nielsen. Indeed, it is only by characterizing Acting Secretary McAleenan as an inferior officer—rather than a department head who must be Senate confirmed to that role—that *McAleenan's* own appointment to that role by Secretary Nielsen can be reconciled with the Appointments Clause.

The two-step appointment process by which Secretary Nielsen appointed Acting Secretary McAleenan and McAleenan appointed Defendant Wolf thus undercuts McAleenan's authority to appoint Defendant Wolf. Either McAleenan, as Acting Secretary, was an inferior officer—not truly "head" of the department—and therefore lacked the appointment power entirely, or he was head of the department, rather than an inferior officer, and could not have been appointed by Nielsen. The government has never explained in any of the litigation to date how the Appointments Clause allowed McAleenan to appoint Defendant Wolf. And because Defendant Wolf is invalidly serving as Acting Secretary, his designation of Defendant Edlow, the purported Deputy Director for Policy of Defendant United States Citizenship and Immigration Services ("USCIS"), is also unlawful.

At a minimum, the HSA must be read narrowly to avoid these constitutional difficulties. The HSA was never intended—and before the Trump Administration, was never used—to authorize a series of successive Acting Secretaries to name their successors. The HSA vests the authority to promulgate succession orders only in the "Secretary," not the "Acting Secretary," and the statute expressly distinguishes between those two positions. 6 U.S.C. § 113(g). In light of the attendant constitutional difficulties, Congress cannot be understood to have authorized someone it never confirmed as head of department to hand the reins to one of the most powerful federal agencies—with coercive authority

---

[6] Donald J. Trump (@realDonaldTrump), TWITTER, (Aug. 25, 2020, 12:30 PM), https://twitter.com/realDonaldTrump/status/1298296592764735490.

Gibson, Dunn &
Crutcher LLP

over millions of U.S. immigrants and the ability to send troops into U.S. cities,[7] and conduct surveillance of American citizens[8]—without any oversight by Congress or even any by a Senate-confirmed officer.

Notwithstanding the lack of a statutory or constitutional basis for Defendant Wolf's purported assumption to the Acting Secretary role, the Wolf Memorandum, and the resulting implementing memorandum from Defendant Edlow, are deficient under the APA. Specifically, they fail to provide a reasoned analysis for the curtailment of DACA for an indefinite period of time, and fail to consider important aspects of the problem. Thus, the memoranda are arbitrary and capricious under the APA.

Accordingly, Plaintiffs file this amended complaint to seek equitable and injunctive relief declaring that Defendant Wolf is an invalid Acting Secretary under the Homeland Security Act and the U.S. Constitution, enjoining his unlawful, unconstitutional and arbitrary and capricious modification of DACA, and compelling the government to restore DACA in full.

## JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT

1.     This Court has jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States. This Court has additional remedial authority under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, and the APA, 5 U.S.C. §§ 701–706.

2.     Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1) because at least one plaintiff resides in this District, a substantial part of the

---

[7]  *See* 40 U.S.C. § 1315 (allowing federal officers to protect federal property); *see also* Melissa Quinn, *White House defends legality of use of federal agents in Portland*, CBS News (July 21, 2020), https://www.cbsnews.com/news/portland-protests-federal-agents-white-house-dhs-legality/ (reporting that White House Press Secretary cited 40 U.S.C. § 1315 to "to deputize Homeland Security employees 'in connection with the protection of' federal property"); Colin Kalmbacher, *Portland Activists Sue DHS, Chad Wolf, and Bill Barr to Stop Use of Tear Gas Against Protestors*, Law & Crime (July 27, 2020), https://lawandcrime.com/george-floyd-death/portland-activists-sue-dhs-chad-wolf-and-bill-barr-to-stop-use-of-tear-gas-against-protesters/.

[8]  *See Office of Intelligence & Analysis*, DHS (Aug. 7, 2020), https://www.dhs.gov/office-intelligence-and-analysis (stating that I&A's "main focus" is to equip DHS "with the intelligence and information it needs to keep the Homeland safe, secure, and resilient"); Steve Vladeck & Benjamin Wittes, *DHS Authorizes Domestic Surveillance to Protect Statues and Monuments* (July 20, 2020), https://www.lawfareblog.com/dhs-authorizes-domestic-surveillance-protect-statues-and-monuments (explaining the "kinds of collection and surveillance" that DHS can "engage in for intelligence purposes").

Gibson, Dunn & Crutcher LLP

1    events or omissions giving rise to this action occurred in this District, and each defendant is an agency

2    of the United States or an officer of the United States sued in his or her official capacity.

3        3.      Pursuant to Local Rules 3-2(c) and (d), intradistrict assignment remains proper in San

4    Francisco because a substantial part of the events or omissions which give rise to the claim occurred

5    in the County of San Francisco.

6                                              **PARTIES**

7        4.      Plaintiff Dulce Garcia ("Ms. Garcia") is a DACA recipient and an attorney in San

8    Diego, California.  Ms. Garcia earned her bachelor's degree from the University of California, San

9    Diego and her law degree from the Cleveland-Marshall College of Law.  She arrived in the United

10   States from Mexico when she was four years old.  The Wolf Memorandum harms Ms. Garcia by

11   restricting her ability to apply for advanced parole, which she had intended to apply for after the

12   Supreme Court decision, and shortening the renewal period from two years to one year, thereby

13   requiring Ms. Garcia to pay an annual fee for renewal.  The Wolf Memorandum, moreover,

14   reintroduces severe fear, stress, and anxiety into Ms. Garcia's life while Defendant Wolf purportedly

15   reconsiders the program for an unspecified period of time.

16       5.      Plaintiff Jirayut ("New") Latthivongskorn ("Mr. Latthivongskorn") is a DACA

17   recipient and a medical resident at Zuckerberg San Francisco General Hospital and Trauma Center

18   after graduating from the University of California, San Francisco ("UCSF") School of Medicine.  He

19   also received a Master of Public Health degree from the T.H. Chan School of Public Health at Harvard

20   University.  Mr. Latthivongskorn arrived in the United States from Thailand when he was nine years

21   old.  The Wolf Memorandum harms Mr. Latthivongskorn by restricting his ability to apply for

22   advanced parole, which he had intended to apply for after the Supreme Court decision, and by

23   shortening the renewal period from two years to one year, thereby requiring Mr. Latthivongskorn to

24   pay an annual fee for renewal.  The Wolf Memorandum reintroduces severe fear, stress, and anxiety

25   into Mr. Latthivongskorn's life while Defendant Wolf purportedly reconsiders the program for an

26   unspecified period of time.

27       6.      Plaintiff Norma Ramirez ("Ms. Ramirez") is a DACA recipient and a candidate for a

28   Ph.D. in Clinical Psychology from the Fuller Theological Seminary in Pasadena, California.  She is

currently interning at the Child and Family Guidance Center providing therapy and psychological assessments in a community mental health setting.  Ms. Ramirez arrived in the United States from Mexico when she was five years old.  The Wolf Memorandum harms Ms. Ramirez by restricting her ability to apply for advanced parole, which she had intended to apply for after the Supreme Court decision, and shortening the renewal period from two years to one year, thereby requiring Ms. Ramirez to pay an annual fee for renewal.  The Wolf Memorandum reintroduces severe fear, stress, and anxiety into Ms. Ramirez's life while Defendant Wolf purportedly reconsiders the program for an unspecified period of time.

7.     Plaintiff Miriam Gonzalez Avila ("Ms. Gonzalez") is a DACA recipient and a teacher at Crown Preparatory Academy in Los Angeles, California.  She also received a Master of Arts in Urban Education from Loyola Marymount University.  Ms. Gonzalez arrived in the United States from Mexico when she was six years old.  The Wolf Memorandum harms Ms. Gonzalez by shortening the renewal period from two years to one year, thereby requiring Ms. Gonzalez to pay an annual fee for renewal.  It also harms her by restricting her ability to apply for advanced parole to visit her maternal grandmother whose health has been declining over the past year.  The Wolf Memorandum, moreover, reintroduces severe fear, stress, and anxiety into Ms. Gonzalez's life while Defendant Wolf purportedly reconsiders the program for an unspecified period of time.

8.     Plaintiff Saul Jimenez Suarez ("Mr. Jimenez") is a DACA recipient and a special education teacher, coach, and mentor in Los Angeles, California.  Mr. Jimenez arrived in the United States from Mexico when he was one year old.  The Wolf Memorandum harms Mr. Jimenez by restricting his ability to apply for advanced parole, which he had intended to apply for after the Supreme Court decision, and by shortening the renewal period from two years to one year, thereby requiring Mr. Jimenez to pay an annual fee for renewal.  The Wolf Memorandum reintroduces severe fear, stress, and anxiety into Mr. Jimenez's life while Defendant Wolf purportedly reconsiders the program for an unspecified period of time.

9.     Plaintiff Marco Antonio Salinas Munoz ("Mr. Munoz") applied for DACA after the Supreme Court's ruling and is currently a high school student.  Mr. Munoz arrived in the United States from Mexico when he was three years old and otherwise meets the criteria for obtaining DACA.  The

1   Wolf Memorandum deprives Mr. Munoz of the opportunity to obtain DACA and the opportunity to

2   apply for its many corresponding benefits. The Wolf Memorandum imposes severe obstacles to Mr.

3   Munoz achieving his dream of studying at the University of California, Berkeley and becoming a

4   mechanical engineer.

5           10.     Plaintiff Dulce Berenice Vargas Baltazar ("Ms. Baltazar") is a first-year student at

6   Chico State University. After the Supreme Court's ruling, she had hoped to apply for DACA for the

7   first time. Ms. Baltazar arrived in the United States from Mexico when she was one year old and

8   otherwise meets the criteria for obtaining DACA. The Wolf Memorandum deprives Ms. Baltazar of

9   the opportunity to apply for and obtain DACA, and to apply for its many corresponding benefits. The

10  Wolf Memorandum also imposes severe obstacles to Ms. Baltazar's dream of attending law school

11  and helping individuals from disadvantaged and underrepresented communities obtain justice through

12  the legal system.

13          11.     Plaintiff Ericka Lisseth Daniel Santellan ("Ms. Santellan") is an admitted student at

14  Mt. San Antonio College. After the Supreme Court's ruling, she had hoped to apply for DACA for

15  the first time. Ms. Santellan arrived in the United States from Mexico when she was one year old and

16  otherwise meets the criteria for obtaining DACA. The Wolf Memorandum deprives Ms. Santellan of

17  the opportunity to apply for and obtain DACA, and to apply for its many corresponding benefits. The

18  Wolf Memorandum also imposes severe obstacles to Ms. Santellan's dream of becoming a nurse and

19  providing care to those in need.

20          12.     Plaintiff Grisel Guadalupe Chavez Diaz ("Ms. Diaz") is a first-year student at the

21  University of California, Berkeley. After the Supreme Court's ruling, she had hoped to apply for

22  DACA for the first time. Ms. Diaz arrived in the United States from Mexico when she was three years

23  old and otherwise meets the criteria for obtaining DACA. The Wolf Memorandum deprives Ms. Diaz

24  of the opportunity to apply for and obtain DACA, and to apply for its many corresponding benefits.

25  The Wolf Memorandum also imposes severe obstacles to Ms. Diaz's dream of becoming an architect

26  and providing sustainable housing for low-income households.

27          13.     Plaintiff Felipe Alvarez Carrillo ("Mr. Carrillo") is a computer programmer. After

28  the Supreme Court's ruling, he had hoped to apply for DACA for the first time. Mr. Carrillo arrived

Gibson, Dunn &
Crutcher LLP

FIRST AMENDED COMPLAINT
CIVIL CASE NO.: 3-17-CV-05380-WHA
8

in the United States from Mexico when he was nine years old and otherwise meets the criteria for obtaining DACA.  The Wolf Memorandum deprives Mr. Carrillo of the opportunity to apply for and obtain DACA, and to apply for its many corresponding benefits.  The Wolf Memorandum also imposes severe obstacles to frustrate Mr. Carrillo's dream of starting his own business designing computers and virtual reality stations.[9]

14.     Defendant United States of America includes all government agencies and departments responsible for the implementation, administration, termination, and curtailment of the DACA program.

15.     Defendant Department of Homeland Security ("DHS") is a cabinet department of the federal government with responsibility for, among other things, administering and enforcing the nation's immigration laws.

16.     Defendant United States Citizenship and Immigration Services ("USCIS") is an operational and support component agency within DHS, with responsibility for, among other things, administering the nation's immigration system.

17.     Defendant Chad F. Wolf is purportedly Acting Secretary of Homeland Security and is sued in his purported official capacity.  Secretary Wolf is responsible for managing DHS, including the administration and enforcement of policies and practices related to DACA.

18.     Defendant Joseph Edlow is the purported Deputy Director for Policy of USCIS. Purported Deputy Director Edlow issued additional guidance regarding the implementation of the Wolf Memorandum on August 21, 2020.

## STATEMENT OF FACTS

### I.     The DACA Program

19.     On June 15, 2012, then-Secretary of Homeland Security Janet Napolitano issued a memorandum establishing the DACA program (the "2012 DACA Memorandum").  Under DACA,

---

[9]   After the original complaint was filed, Plaintiff Viridiana Chabolla Mendoza was granted Lawful Permanent Resident status, and no longer asserts a cause of action against Defendants.

Gibson, Dunn & Crutcher LLP

individuals who arrived in the United States as young children and who met certain specific criteria may request deferred action for a fixed period of time—originally, two years—subject to renewal.[10]

20.    Once accepted into the program, DACA recipients are granted the right not to be arrested or detained based solely on their immigration status during the time period their deferred action is in effect.[11]

21.    DACA recipients are also eligible for work authorization under long-standing regulations and certain public benefits, such as Social Security, retirement, and disability benefits, and, in certain states, benefits such as driver's licenses, health care, financial aid, tuition benefits, and unemployment insurance.[12]

22.    Additionally, DACA recipients do not accrue time under 8 U.S.C. § 1182(a)(9)(B)(i).

23.    The original DACA program also permitted recipients to apply for advanced parole to briefly depart the U.S. and legally return under certain circumstances.[13]

24.    In addition to these legal benefits, DACA serves as a gateway to numerous other important public and private practical benefits, enabling recipients to open bank accounts, obtain

---

[10] Memorandum from Secretary Janet Napolitano, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children*, at 1–2 (June 15, 2012), https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf (hereinafter "2012 DACA Memorandum"). The criteria required that the applicant: (1) came to the United States under the age of sixteen; (2) has continuously resided in the United States for at least five years preceding the date of the memorandum and is present in the United States on the date of the memorandum; (3) is currently in school, has graduated from high school, has obtained a general education development certificate, or is an honorably discharged veteran of the Coast Guard or Armed Forces of the United States; (4) has not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise poses a threat to national security or public safety; and (5) is not above the age of thirty. *Id.* at 1.

[11] *See* USCIS DACA FAQs (Archived), Question 9, https://www.uscis.gov/archive/frequently-asked-questions (hereinafter "USCIS DACA FAQs") ("[I]f an individual meets the guidelines for DACA, CBP or ICE should exercise their discretion on a case-by-case basis to prevent qualifying individuals from being apprehended."); 2012 DACA Memorandum, at 2; *see also Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1058–59 (9th Cir. 2014).

[12] *See* 8 U.S.C. §§ 1611(b)(2)–(3), 1621(d); *Texas v. United States*, 809 F.3d 134, 148 (5th Cir. 2015), *aff'd*, 136 S. Ct. 2271 (2016); *Ariz. Dream Act Coal. v. Brewer*, 81 F. Supp. 3d 795, 811 (D. Ariz. 2015), *aff'd*, 818 F.3d 901 (9th Cir. 2016) ; *see also, e.g.*, Cal. Educ. Code §§ 66021.6-66021.7, 68130.5, 76300.5; Cal. Code Regs. tit. 22, § 50301.3.

[13] *See* USCIS DACA FAQs, Question 57.

credit cards, start businesses, purchase homes and cars, start families, and conduct other aspects of daily life that would otherwise be unavailable to them.

25.     DACA has been widely perceived as a success.  The program has enabled nearly 800,00 individuals to live and work in the United States without fear of deportation.  Today, DACA protects nearly 700,000 current recipients.  DACA recipients and their families—including 200,000 U.S.-born children—as well as their employers and educational institutions, have made significant decisions based on forbearance from removal.[14]  DACA recipients are deeply integrated into communities across the United States, contributing more than $42 billion to the annual GDP in the United States.[15]

## II.     Plaintiffs' Successful Challenge To The Trump Administration's First Attempt To Rescind DACA

26.     Despite DACA's success and widespread bipartisan support, then-Acting Secretary of Homeland Security Duke issued a memorandum on September 5, 2017 formally rescinding the DACA program.[16]

27.     On September 18, 2017, Plaintiffs Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez, and Jirayut Latthivongskorn filed suit challenging the Duke Memorandum under the APA.  *See Garcia v. United States*, No. 3:17-cv-5380 (N.D. Cal. Sept. 18, 2017).  The suit was consolidated with three related actions under *Regents of the University of California v. United States Dep't of Homeland Security ("Regents I")*, No. 3:17-cv-5211, which had been filed on September 8, 2017.[17]

---

[14] *See* Roberto G. Gonzales, et al., *The Long-Term Impact of DACA: Forging Futures Despite DACA's Uncertainty* at 7, Immigration Initiative at Harvard (2019), *available at* https://immigrationinitiative.harvard.edu/files/hii/files/final_daca_report.pdf.

[15] *DACA Facts: The Case for Protecting Dreamers*, fwd.us (Apr. 16, 2020) https://www.fwd.us/news/daca-facts/.

[16] Memorandum from Acting Secretary Elaine C. Duke, Rescission of the June 15, 2012 Memorandum Entitled *"Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children"* (Sept. 5, 2017), https://www.dhs.gov/news/2017/09/05/memorandum-rescission-daca.

[17] *See State of California v. United States Department of Homeland Security*, No. 1:17-cv-5235 (N.D. Cal. Sept. 11, 2017); *City of San Jose v. Trump*, No. 5:17-cv-5329 (N.D. Cal. Sept. 14, 2017); *see also* ECF Nos. 41, 43 (orders relating cases).

28.     Following extensive motions practice, on January 9, 2018, this Court granted the first nationwide, preliminary injunction ordering the Trump Administration to "maintain" DACA "on a nationwide basis on the same terms and conditions as were in effect before the rescission on September 5, 2017." *Regents I*, 279 F. Supp. 3d 1011, 1048 (N.D. Cal. 2018).  The Court reasoned that Plaintiffs were likely to prevail on the merits of their claim that the Duke Memorandum was arbitrary and capricious in violation of the APA.  *Id.* at 1037.  While this Court's decision reinstated renewals, its ruling did not apply to first-time applications or requests for advance parole.  In *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 436 (E.D.N.Y. 2018), the Eastern District of New York quickly followed suit, granting an identical preliminary injunction.  The Ninth Circuit ultimately affirmed this Court's preliminary injunction on appeal.  *See Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec. ("Regents II")*, 966 F.3d 1036 (9th Cir. 2020).

29.     Two related lawsuits simultaneously proceeded to judgments on the merits.   In *NAACP v. Trump*, 315 F. Supp. 3d 457 (D.D.C. 2018), the D.C. district court ultimately granted summary judgment to plaintiffs challenging the Duke Memorandum and ordered that memorandum vacated, but stayed vacatur pending appeal except as to renewal applications that were already covered by this Court's preliminary injunction.  *See NAACP v. Trump*, 321 F. Supp. 3d 143, 149-50 (D.D.C. 2018).  And in *Casa de Maryland v. U.S. Dep't of Homeland Security ("Casa I")*, 284 F. Supp. 3d 758, 773 (D. Md. 2018), the District of Maryland initially ruled that the Duke Memorandum did not violate the APA, but the Fourth Circuit reversed that ruling and vacated the rescission as arbitrary and capricious, *Case de Maryland v. U.S. Dep't of Homeland Security ("Casa II")*, 924 F.3d 684, 707 (4th Cir. 2019).

30.     The Supreme Court granted *certiorari* from three of these cases—the Ninth Circuit's decision in this case, the Eastern District of New York's decision in *Batalla Vidal*, and the D.C. district court's decision in *NAACP*—and consolidated them for briefing and argument.[18]

31.     On June 18, 2020, the Supreme Court issued its decision affirming all three lower court rulings.  The Court determined the decision to rescind DACA was subject to judicial review

---

[18]  *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, No. 18-587; *Trump v. NAACP*, No. 18-588; *Wolf v. Batalla Vidal*, No. 18-589.

Gibson, Dunn &
Crutcher LLP

under the APA and was arbitrary and capricious in violation of that statute. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal. ("Regents III")*, 140 S. Ct. 1891, 1906 (2020). The Court analyzed only the Duke Memorandum and found that it suffered from two legal defects: It neither contained a "discussion of forbearance or the option of retaining forbearance without benefits," nor addressed the "'legitimate reliance'" on DACA. *Id.* at 1913-15. The court emphasized that the "'the Government should turn square corners in dealing with the people.'" *Id.* at 1909.

32. After the Court's decision, the Supreme Court denied the government's petition for writ of *certiorari* in *Casa II*, and the Fourth Circuit issued its mandate. The Ninth Circuit also issued its mandate in this case, and the courts of appeals issued mandates affirming the decisions in *Batalla Vidal* and *NAACP*. *Regents*, ECF No. 303.

33. By affirming the merits decision in *NAACP*, the Supreme Court ensured that the Duke Memorandum would be vacated pursuant to that decision and the Fourth Circuit's decision in *Casa II*. This required DHS to fully restore DACA, including accepting first-time applications from approximately 300,000 individuals who had become eligible for DACA during the litigation, and processing requests for advance parole from current DACA recipients.[19] The district court in *Casa I* made this explicit by ordering the government to reinstate DACA as it existed prior to the Duke Memorandum. Order, *Casa I*, ECF No. 97, at 3 (D. Md. July 17, 2020).

34. As a result, and after years of waiting with uncertainty, Plaintiffs Munoz, Baltazar, Santellan, Diaz, Carrillo and other Dreamers intended to prepare, prepared or submitted applications to obtain DACA for the first time. Plaintiffs Garcia, Latthivongskorn, Ramirez, Gonzalez, Jimenez and other current DACA recipients intended to prepare, prepared, or submitted requests for advance parole to travel freely and return to the United States without penalty. And finally, Plaintiffs Garcia, Latthivongskorn, Ramirez, Gonzalez, Jimenez, and other current DACA recipients intend to prepare or have prepared or submitted applications for their DACA to be renewed during the period covered by the Wolf Memorandum.

---

[19] *See* Nicole Prchal Svajlenka et al., *The Trump Administration Must Immediately Resume Processing New DACA Applications*, Center for American Progress (July 13, 2020), https://www.americanprogress.org/issues/immigration/news/2020/07/13/487514/trump-administration-must-immediately-resume-processing-new-daca-applications/.

Gibson, Dunn & Crutcher LLP

III.    **Defendant Wolf Purports To Assume The Office Of Acting Secretary Of DHS Pursuant To Homeland Security Act**

35.    Compliance with the Supreme Court's orders fell to the current leadership of DHS, which had changed repeatedly throughout the three-year course of litigation.  At the time of the decision, and still today, DHS's day-to-day operations were conducted under the leadership of Defendant Wolf, purporting to act under the title of Acting Secretary of Homeland Security pursuant to the Homeland Security Act during the vacancy left by Secretary Nielsen's departure from office. Defendant Wolf's path to that office is at the heart of this case.

*A.    The Statutory Framework*

36.    Vacancy appointments for most federal offices are governed by the Federal Vacancies Reform Act, 5 U.S.C. § 3345 *et seq*.  The FVRA governs who may serve as the acting head of an agency "[i]f an officer of an Executive agency . . . whose appointment to the office is required to be made by the President, by and with the advice and consent of the Senate . . . resigns." *Id.* § 3345(a).

37.    The FVRA sets forth three ways for an acting officer to assume an office that requires advice and consent of the Senate when a vacancy arises.  First, "the first assistant to the office of such officer" shall perform the duties in an acting capacity.  5 U.S.C. § 3345(a)(1).  Second, the President may direct an official who already serves in an office for which appointment is required by and with the advice and consent of the Senate.  *Id.* § 3345(a)(2).  Third, the President may direct "an officer or employee of such Executive agency," if such officer of employee meets certain criteria not relevant here.  *Id.* § 3345(a)(3).

38.    Notwithstanding certain exceptions not relevant here, a person who fills a vacancy pursuant to one of these three routes may only serve in that "'office' for 210 days as measured from the date of vacancy."  *See Casa III*, 2020 WL 5500165, at *15 (citing 5 U.S.C. § 3346(a)(1)).

39.    Section 3348 provides that unless an officer is "performing . . . functions and duties" in accordance with the FVRA, including the 210-day limitation set forth in Section 3346, the office "shall remain vacant."  5 U.S.C. § 3348(b)(1).  Under this provision, any action taken by an official who occupies the position contrary to the FVRA "shall have no force or effect."  *Id.* § 3348(d)(1).

40.    While the FVRA is the exclusive means for authorizing acting service, a statute may qualify as an exception if it expressly "authorizes" the President, a court, or the Head of a Department,

Gibson, Dunn &
Crutcher LLP

"to designate an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity" or "designates an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity."  5 U.S.C. § 3347(a)(1).

41.    The Homeland Security Act is one such exception.  The HSA provides an order of succession outside of the FVRA when a vacancy arises in the position of Secretary of Homeland Security.  *Id.*

42.    The HSA created DHS and the position of Secretary of Homeland Security to head the department and "have direction, authority, and control over it."  HSA, Pub. L. No. 107-296, 116 Stat. 2135, 2142, title I, § 102.  The Secretary is to be "appointed by the President, by and with the advice and consent of the Senate."  *Id.*

43.    The HSA also created the position of Deputy Secretary of Homeland Security ("Deputy Secretary") and made the Deputy Secretary the "first assistant for purposes of" the FVRA.  6 U.S.C. § 113(a)(1)(A).

44.    If the Office of the Deputy Secretary is vacant, the HSA provides that, "notwithstanding" the FVRA, the "Under Secretary for Management shall serve as the Acting Secretary."  *Id.* § 113(g)(1).

45.     In the event the top three positions are vacant, the HSA contains a provision providing that "the Secretary may designate such other officers of the Department in further order of succession to serve as Acting Secretary."  6 U.S.C. § 113(g)(2).

### B.    The First Nielsen Delegation

46.    In December 2016, then-Secretary of Homeland Security Jeh Johnson issued Delegation Order 00106.[20]  This document has been the "DHS' repository for changes to the order of succession for the office of the Secretary," and it is "updated any time the Secretary changes the succession orders."  *Casa III*, 2020 WL 5500165, at *20.

---

[20]  DHS*, Orders of Succession and Delegations of Authorities for Named Positions,* Delegation No. 00106, Revision No. 08.5 (Dec. 15, 2016).

Gibson, Dunn &
Crutcher LLP

47.     In February 2019, then-Secretary of Homeland Security Kirstjen Nielsen exercised authority under the HSA to designate an order of succession in Delegation Order 00106 ("First Nielsen Delegation").[21]

48.     The First Nielsen Delegation set forth two grounds for assuming the position of Acting Secretary.  The first ground occurred in the event of the Secretary's death, resignation, or inability to perform the functions of the office, and the second occurred if the Secretary was unavailable to act during a disaster or catastrophic emergency.  GAO Report, at 5; First Nielsen Delegation, § II.A-II.B.

49.     Each ground had its own order of succession.  In the cases of the Secretary's death, resignation, or inability to perform the functions of the office, the order of succession was governed by Executive Order 13753.  First Nielsen Delegation, § II.A.  Executive Order 13753 required succession to the Acting Secretary role in the following order:

> (1) Deputy Secretary;
>
> (2) Under Secretary for Management;
>
> (3) Administrator of the Federal Emergency Management Agency ("FEMA Administrator");
>
> (4) Under Secretary for National Protection and Programs;[22]
>
> (5) Under Secretary for Science and Technology;
>
> (6) Under Secretary for Intelligence and Analysis; and
>
> (7) CBP Commissioner.

50.     In cases where the Secretary is unavailable to act during a disaster or catastrophic emergency, Annex A governed the order of the succession.  *See* First Nielsen Delegation § II.B.  At this time, the order of succession found in Annex A was the same as the order of succession in Executive Order 13753.  *See* GAO Report, at 5.

---

[21] *See* GAO Report, at 5.

[22] This agency preceded the Cybersecurity and Infrastructure Security Agency ("CISA").

### C.     Secretary Nielsen's Resignation And The Second Nielsen Delegation

51.     On April 7, 2019, Secretary Nielsen announced her resignation.[23]  On the same day, President Trump announced via Twitter that Kevin McAleenan (then-CBP Commissioner) would assume the role of Acting DHS Secretary.[24]  Later that day, Secretary Nielsen announced, also via Twitter, that she would remain Secretary until April 10, 2019.[25]

52.     Before she left the Office, Secretary Nielsen updated the succession order in Delegation No. 00106 ("Second Nielsen Delegation").[26]  The Second Nielsen Delegation modified Annex A (the order of succession for vacancies in the event of disaster or catastrophic emergency). It changed that order of succession to the following:

> (1) Deputy Secretary;
>
> (2) Under Secretary for Management;
>
> (3) CBP Commissioner; and
>
> (4) Administrator of FEMA.

See Second Nielsen Delegation, Annex A.  The Second Nielsen Delegation thus removed the Director of the National Protection and Programs Directorate (now CISA) from the order of succession and elevated the CBP Commissioner to third in line in the event of disaster or catastrophic emergency. The Second Nielsen Delegation preserved the applicability of Executive Order 13753 for vacancies triggered upon the Secretary's death, resignation, or inability to perform the functions of the Office.

53.     On April 10, 2020, Secretary Nielsen left office, and Under Secretary for Management Claire Grady resigned.

---

[23]  Letter from Kirstjen M. Nielsen, Sec'y of Homeland Sec., to Donald J. Trump, President, Apr. 7, 2019,      https://www.dhs.gov/sites/default/files/publications/19_0407_s1_nielsen-resignation-letter.pdf.

[24]  Donald J. Trump (@realDonaldTrump), TWITTER, (Apr. 7, 2019, 6:02 PM), https://twitter.com/realDonaldTrump/status/1115011885303312386.

[25]  Secretary Kirstjen M. Nielsen (@SecNielsen), TWITTER, (Apr. 7, 2019, 10:36 PM), https://twitter.com/SecNielsen/status/1115080823068332032

[26]  See DHS, Orders of Succession and Delegations of Authorities for Named Positions, Delegation No. 00106, Revision No. 08.5 ("April Delegation").

Gibson, Dunn &
Crutcher LLP

1

### D.     McAleenan's Purported Appointment And The McAleenan Delegation

2      54.     The government treated the Second Nielsen Delegation as if it amended the

3 succession order that is triggered in the event of a Secretary's resignation.  Accordingly, CBP

4 Commissioner Kevin McAleenan assumed the role of Acting Secretary.

5      55.     On November 8, 2019, the 212th day of his purported designation as Acting

6 Secretary, McAleenan purported to revise Delegation Order 00106.  *See* DHS, *Orders of Succession*

7 *and Delegations of Authorities for Named Positions*, Delegation No. 00106, Revision No. 08.6

8 ("McAleenan Delegation").

9      56.     The McAleenan Delegation purported to make two changes.  First, it replaced the

10 order of succession for vacancies caused by death, resignation, or inability to perform the Office's

11 function, which was set forth in Executive Order 13753, with the succession order outlined in Annex

12 A to the Second Nielsen Delegation.  *See* McAleenan Delegation §§ II.A.  Second, McAleenan also

13 purported to change the order of succession found in Annex A so that Under Secretary for Strategy,

14 Policy, and Plans, a newly created position, would be next in line in the event of a vacancy caused by

15 death, resignation, or inability to perform the Office's functions.  *See* McAleenan Delegation, Annex

16 A.  As a result of these changes, the succession order would be as follows:

17           (1) Deputy Secretary;

18           (2) Under Secretary for Management;

19            (3) CBP Commissioner; and

20           (4) Under Secretary for Strategy, Policy, and Plans.

21 *Id*.

22     ### E.     Mr. Wolf's Purported Appointment

23      57.     On November 13, 2019, the Senate confirmed Defendant Wolf to the position of

24 Under Secretary for Strategy, Policy, and Plans.

25      58.     On the same day, McAleenan resigned as both Acting Secretary and CBP

26 Commissioner.

27      59.     The government treated the McAleenan Delegation as a valid revision to the

28 succession order.  Accordingly, Defendant Wolf purported to assume the office of Acting Secretary

when McAleenan resigned, and remained in office at the time of the Supreme Court's decision in *Regents III*.

60.     Defendant Wolf purportedly designated Defendant Edlow Deputy Director for Policy at USCIS on February 19, 2020.

61.     More than 500 days after Secretary Nielsen resigned, the President indicated his intent to nominate Defendant Wolf for DHS Secretary on August 25, 2020.

### IV.    The Wolf And Edlow Memoranda And The Harm Caused To Plaintiffs

62.     Despite the court orders reinstating DACA, DHS—under Defendant Wolf's purported tenure as Acting Secretary—did not adjudicate any initial DACA applications or requests for advance parole, despite receiving them.  DHS additionally failed to provide any information regarding whether and when the agency would begin to accept new applications or process advanced parole requests.

63.     DHS broke its silence in July 2020 when Defendant Wolf issued the Wolf Memorandum executing drastic cuts to the DACA program.

64.     The Wolf Memorandum confirmed that DHS had received first-time applications for DACA and requests for advance parole, but had not processed them and instead "generally held" those requests.[27]

65.     While the Wolf Memorandum indicated that Defendant Wolf would undertake a "full reconsideration of the DACA policy," it provided for "certain immediate changes" that revoke or curtail core components of DACA.[28]  It requires DHS to (1) reject categorically all initial DACA applications and associated applications for work authorization, (2) reject all pending and future applications for advance parole "absent exceptional circumstances," and (3) limit the renewal period to one year rather than two years thereby requiring current DACA recipients to pay a fee annually.[29]

66.     As a basis for these "immediate changes," the Wolf Memorandum offered the following "concerns": (1) Congress's inability to enact a legislative solution; (2) Defendant Wolf's

---

[27]  Wolf Memorandum, at 7.

[28]  *Id.* at 1.

[29]  *Id.* at 1, 7–8.

Gibson, Dunn &
Crutcher LLP

"reservations as a matter of policy about . . . maintaining a formal process, for non-enforcement"; and (3) "sending mixed messages" that "may contribute to the general problem of illegal immigration," which is "more pressing in the context of children."[30]  Defendant Wolf claimed that the changes implemented to DACA would "mitigate" these concerns "without encroaching materially on the reliance interests that have been raised by individuals, organizations, and state and local governments during the course of the extensive litigation."[31]

67.     On August 21, 2020, Defendant Edlow issued a memorandum, (the "Edlow Memorandum"), instructing USCIS officials to take actions directed by the Wolf Memorandum.[32]  The Edlow Memorandum provides that any DACA renewal application filed "more than 150 days" before the expiration of the recipient's status would be rejected to promote "efficient use of agency resources."[33]  The Edlow Memorandum additionally states that USCIS will reject all advance parole applications filed before the Wolf Memorandum and provides that in most instances USCIS will reject advance parole requests to travel abroad for educational or employment-related purposes or to visit family members.[34]

68.     Together, the Wolf and Edlow Memoranda effectively nullify the Supreme Court's decision requiring DHS to restore the DACA policy in full pending the appropriate agency action.  They cause severe harm to Plaintiffs as well as hundreds of thousands of Dreamers.

69.     At the threshold, the memoranda deprive Plaintiffs Munoz, Baltazar, Santellan, Diaz, Carrillo, and other Dreamers of the opportunity to apply for and obtain DACA for the first time.  The memoranda, therefore, deprive Plaintiffs and other Dreamers of the opportunity to be safe from deportation and to apply for corresponding benefits, such as work authorization and Social Security.

70.     The memoranda, for example, severely harm Plaintiff Munoz and other Dreamers who have already applied for DACA after the Supreme Court's ruling.  They have been denied the

---

[30]  *Id.* at 5.

[31]  *Id.*

[32]  Memorandum from Joseph Edlow, *Implementing Acting Secretary Chad Wolf's July 28, 2020 Memorandum*, (Aug. 21, 2020), https://www.uscis.gov/sites/default/files/document/policy-alerts/dacamemo.pdf.

[33]  *Id.* at 5.

[34]  *Id.* at 2, 6.

Gibson, Dunn &
Crutcher LLP

opportunity to be safe from deportation, and are vulnerable now that they have turned over sensitive personal information to the federal government in their applications.

71.     The memoranda additionally harm Plaintiffs Garcia, Gonzalez, Ramirez, Latthivongskorn, Jimenez, and other current DACA recipients who must seek renewal every year, rather than every two years.  The shortened renewal period imposes a financial burden and creates stress and anxiety.

72.     The memoranda additionally harm Plaintiffs by depriving them of important opportunities to further their education and/or earn a living.  For example, Plaintiff Baltazar will be unlikely to attend and graduate from law school; Plaintiff Santellan will be unlikely to attend and graduate from nursing school; Plaintiff Diaz will be unlikely to fulfill her dream of becoming an architect and provide sustainable housing for low-income households; Plaintiff Munoz will be unlikely to complete his study at University of California, Berkeley and become a mechanical engineer; and Plaintiff Carrillo will be less likely to start his own business.  The memoranda therefore hang Plaintiffs' promising futures in the balance, subjecting Plaintiffs to unnecessary fear, anxiety and stress.  Indeed, the Wolf Memorandum may cause Plaintiffs Munoz, Baltazar and other talented Dreamers to drop out of school because they will not be able to afford tuition given the loss of available financial assistance and the likelihood that they will not be able to work legally upon graduation.  Those already enrolled, such as Plaintiffs Baltazar and Santellan, will be less likely to complete their education due to the loss of current and future earning potential.

73.     The memoranda will also severely harm Plaintiffs and their families.  Because many DACA applicants and recipients also have family overseas, the memoranda's limitations on advance parole will cause DACA applicants to become further estranged from their countries of origin—making the prospect of deportation even more harmful to DACA applicants and recipients and their families.

74.     Finally, DACA recipients' contributions to their families, communities, and their local and national economies cannot be disputed.  Dreamers have contributed an estimated $42 billion

to the economy every year.[35]  The memoranda reduce the number of individuals who can apply for DACA to zero, and thus will necessarily harm the economy and American competitiveness.

**CAUSES OF ACTION**

**FIRST COUNT**

**ADMINISTRATIVE PROCEDURE ACT – VIOLATION OF SUCCESSION ORDER AND HOMELAND SECURITY ACT, 6 U.S.C. § 113(g)(2)**

75.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

76.     DHS is an agency subject to the requirements of the APA.  5 U.S.C. § 701(b)(1).

77.     The Wolf and Edlow Memoranda constitute final agency actions that are reviewable by this Court under the APA.

78.     The APA provides that courts "shall . . . hold unlawful and set aside" final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A)-(C).

79.     Under the HSA, the Secretary of Homeland Security may "designate such other officers of the Department in further order of succession to serve as Acting Secretary." 6 U.S.C. § 113(g)(2).

80.     The Second Nielsen Delegation amended only Annex A and left intact Executive Order 13573 that articulated the succession order that governed in the event of a resignation.  Under that succession order, McAleenan was not next in line to assume the position of Acting Secretary. Thus, McAleenan invalidly succeeded Secretary Nielsen as Acting Secretary.

81.     McAleenan was not a valid Acting Secretary under the HSA, and thus he did not have the authority to amend DHS's succession order.  Accordingly, the McAleenan Delegation is invalid.

82.     The McAleenan Delegation is also invalid because the HSA, by its plain text, vests the power to establish a succession order for the office of Secretary of Homeland Security only on the

---

[35]  Jacqueline Varas, *The Fiscal Implications of the DACA Program,* American Action Forum (Jan. 18, 2018), *available at* https://bit.ly/3j4M0Si.

Gibson, Dunn &
Crutcher LLP

Senate-confirmed "Secretary," not on other officers serving as "Acting Secretary." Even if McAleenan were validly appointed as Acting Secretary, therefore, he would lack statutory authority to amend Secretary Nielsen's operative succession order.

83.     Defendant Wolf assumed the role of Acting Secretary pursuant to the invalid McAleenan Delegation. Thus, Defendant Wolf is not a valid Acting Secretary under the HSA.

84.     Because Defendant Wolf was not lawfully serving as Acting Secretary, Defendant Wolf lacked any legal authority to designate Defendant Edlow to the position of USCIS Deputy Director for Policy.

85.     Defendant Wolf's invalid service as Acting Secretary means that the Wolf Memorandum and the subsequent Edlow Memorandum were issued without authority. Accordingly, the Wolf Memorandum and Edlow Memorandum should be set aside under the APA.

## SECOND COUNT

## ARTICLE II – APPOINTMENTS CLAUSE VIOLATION

86.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

87.     Article II of the U.S. Constitution authorizes only two constitutionally permissible methods for appointing federal officers: (1) by the President with advice and consent of the Senate; and (2) by the President, the courts, and heads of executive departments, if authorized to do so by Congress. *See* U.S. Const. art. II, § 2. "Principal" officers must be appointed by the first method, while "inferior" officers can be appointed by either method. *See Edmond*, 520 U.S. at 660. In this way, the Appointments Clause "serves both to curb Executive abuses of the appointment power . . . and to promote a judicious choice of persons for filling the offices of the union." *Id.* at 659 (quotations marks and alterations omitted). It is a "critical 'structural safeguard [] of the constitutional scheme.'" *NLRB v. Sw. Gen., Inc.*, 137 S. Ct. 929, 935 (2017) (quoting *Edmund*, 520 U.S. at 659).

88.     The Department of Homeland Security is an Executive Department, 5 U.S.C. § 101, and the Secretary of Homeland Security, as a Head of Department, is subject to the Appointments Clause. *See Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Aurelius Inv., LLC*, 590 U.S. ___, 140 S. Ct. 1649, 1657 (2020).

89.     Under the HSA, the Secretary of Homeland Security may "designate such other officers of the Department in further order of succession to serve as Acting Secretary."  6 U.S.C. § 113(g)(2).

90.     Defendant Wolf purported to assume the role of Acting Secretary pursuant to 6 U.S.C. § 113(g)(2).  But Defendant Wolf was not appointed by a constitutionally permissible method under the Appointments Clause.

91.     Even if McAleenan's modification of the succession order could be considered an appointment of Defendant Wolf, McAleenan was not the head (Secretary) of the Department of Homeland Security, and thus lacked the power to make appointments under the Appointments Clause.

92.     At most, in his temporary capacity as Acting Secretary, McAleenan served as an inferior officer, but an inferior office has no appointment authority under the Appointments Clause.

93.     In the alternative, to the extent McAleenan, in his capacity as Acting Secretary, could be considered the actual Head of Department for purposes of the Appointments Clause, he served as a "principal federal office[r]," and therefore could be appointed to that office only by the President with the advice and consent of the Senate.  *Freytag*, 501 U.S. at 884.  Because McAleenan was never Senate confirmed as Acting Secretary, he was never validly vested with the power of a Head of Department to make appointments under the Appointments Clause.

94.     Accordingly, Defendant Wolf's purported appointed violates the Appointments Clause of the U.S. Constitution.

95.     Because Defendant Wolf was not lawfully serving as Acting Secretary, Defendant Wolf lacked any legal authority to designate Defendant Edlow to the position of USCIS Deputy Director for Policy.

96.     Defendant Wolf's invalid service as Acting Secretary means that the Wolf Memorandum and the subsequent Edlow Memorandum were issued without authority.  Accordingly, the Wolf Memorandum and Edlow Memorandum must be set aside.

**THIRD COUNT**

**APA – ARBITRARY AND CAPRICIOUS**

97.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

98.     DHS is an agency subject to the requirements of the APA.  5 U.S.C. § 701(b)(1).

99.     The Wolf and Edlow Memoranda constitute final agency actions that are reviewable by this Court under the APA.

100.     The APA provides that courts "shall . . . hold unlawful and set aside" final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A)-(C).

101.     Pursuant to the arbitrary-and-capricious standard, an agency must engage in "'reasoned decisionmaking.'"  *Michigan v. EPA*, 576 U.S. 743, 750 (2015).  A court reviewing such a decision must assess whether the decision was "based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U. S. 402, 416 (1971); *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014).

102.     In issuing and implementing the Wolf and Edlow Memoranda, Defendants have acted arbitrarily and capriciously under this standard.  Defendants offer no reasoned analysis for modifying DACA other than Defendant Wolf's "desire" to "mitigate" purported concerns about DACA while he "considers anew the DACA policy."  The supposed rationales, however, fail to consider important aspects of the problem.  For example, there is no explanation in the Wolf Memorandum as to how the measures adopted to curtail DACA mitigate his concern that Congress should pass a legislative solution.  Similarly, Defendant Wolf offers no basis for his reservations relating to programmatic deferred action, which is belied by decades of deferred action policies.  *See Regents I*, 279 F. Supp. 3d at 1021-22; *Regents II*, 908 F.3d at 488-89.  Finally, the concerns about "illegal immigration" including in the context of children are baseless, as Defendant Wolf acknowledges that DACA would not apply to those who arrive in the United States today.  At bottom, the Defendants fail to consider

important aspects of the program such as the costs of the gutting the DACA program and the profound reliance interests engendered over the years.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court grant the following relief:

(1)    Declare that Defendant Wolf's service as Acting Secretary of Homeland Security violates the Homeland Security Act of 2016;

(2)    Declare that Defendant Wolf's service as Acting Secretary of Homeland Security violates the Appointments Clause of the United States Constitution;

(3)    Declare that the actions that Defendants have taken to implement the Wolf and Edlow Memoranda are arbitrary, capricious, an abuse of discretion, in excess of statutory authority, and otherwise not in accordance with law in violation of the APA;

(4)    Enjoin Defendants from altering or limiting the DACA program or engaging in any action to frustrate its full and continued implementation;

(5)    Vacate the Wolf and Edlow Memoranda;

(6)    Award Plaintiffs costs of suit and reasonable attorneys' fees and expenses pursuant to any applicable law; and

(7)    Award such additional relief as the interests of justice may require.

Gibson, Dunn &
Crutcher LLP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DATED:  November 2, 2020

San Francisco, California

Respectfully submitted,

/s/ *Theodore J. Boutrous, Jr.*
GIBSON, DUNN & CRUTCHER LLP

/s/ *Mark D. Rosenbaum*
PUBLIC COUNSEL

/s/ *Luis Cortes Romero*
BARRERA LEGAL GROUP, PLLC

/s/ *Laurence H. Tribe*

/s/ *Erwin Chemerinsky*

Attorneys for Plaintiffs DULCE GARCIA;
MIRIAM GONZALEZ AVILA; SAUL
JIMENEZ SUAREZ; NORMA RAMIREZ;
JIRAYUT LATTHIVONGSKORN; MARCO
ANTONIO SALINAS MUNOZ; DULCE
BERENICE VARGAS BALTAZAR; ERICKA
LISSETH DANIEL SANTELLAN; GRISEL
GUADALUPE CHAVEZ DIAZ; and FELIPE
ALVAREZ CARRILLO